2021 IL App (2d) 190009-U
No. 2-19-0009
Order filed April 26, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of De Kalb County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 17-CF-315 |
| | ) | |
| DEONTAYE BRADLEY, | ) | Honorable |
| | ) | Robbin J. Stuckert, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Justices Hutchinson and Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant's conviction of armed violence was supported by (1) the presence of a handgun under the front passenger seat where defendant was sitting when the car was stopped by the police, (2) social media videos of defendant and his fellow occupants from the hours preceding the stop establishing defendant's knowledge of the gun, and (3) defendant's immediate access to the gun from its position under the seat.

¶ 2    During the early morning hours of April 29, 2017, defendant, Deontaye Bradley, was a front-seat passenger in a vehicle that was stopped for a traffic violation. A subsequent search of defendant revealed a clear plastic bag containing 11 individually packaged pills that later tested positive for amphetamine. A gun was located under the front passenger seat. Following a bench

trial, defendant was found guilty of, *inter alia*, armed violence (720 ILCS 5/33A-2(a) (West 2016)) and sentenced to 17 years in prison. On appeal, defendant argues that the State failed to prove him guilty beyond a reasonable doubt of armed violence because the State failed to establish that defendant had knowledge of the gun or immediate access to it. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Defendant was indicted on five counts and subsequently tried on the following charges: count I, armed violence, in that defendant, while armed with a dangerous weapon, committed the felony of unlawful possession of a controlled substance (*id.*); count III, unlawful possession of a controlled substance with intent to deliver (720 ILCS 570/401(c)(7.5)(i) (West 2016)); count IV, unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2016)); and count V, obstructing identification (*id.* § 31-4.5(a)).

¶ 5     The relevant evidence presented at defendant's bench trial established the following.

¶ 6                                    A. The Traffic Stop

¶ 7     City of De Kalb police detective Kris Mecca testified that at about 1:47 a.m. on April 29, 2017, he conducted a traffic stop of a vehicle owned by Kenneth Neal. There were five individuals in the vehicle—Ricky Burrage was the driver, defendant was in the front passenger seat, Neal sat behind Burrage, Rajun Hughes sat in the middle of the back seat, and James Black sat behind defendant. Mecca testified that Burrage drove the vehicle into an angled parking space and Mecca positioned his vehicle behind it. Defendant and Black exited the vehicle on the passenger side. Mecca immediately exited his vehicle and requested additional police units. Defendant and Black got about five to ten feet away from Neal's vehicle before Mecca blocked their path and ordered them to get back into the vehicle. Defendant reentered the front passenger seat of the vehicle;

Black walked around the back of the vehicle and entered through the rear driver's side door, sitting directly behind the driver. Mecca testified that defendant and Black were back in the vehicle within five to ten seconds; it was "very, very quick." Mecca stated that, as defendant and Black were coming at him, "in [his] peripheral vision [he] was looking at the vehicle but [his] primary focus was on [defendant] and Mr. Black." As defendant reentered the vehicle, Mecca remained standing at the front passenger door; the window was partially down. Mecca was able to view everyone in the vehicle as defendant and Black reentered. When Black entered, Neal and Hughes shifted over so that Hughes was now sitting behind defendant. Mecca ordered everyone to place their hands on either the dashboard or the back of the seat in front of them. Mecca did not see anyone reach below the front passenger seat. Numerous backup officers arrived within about two minutes.

¶ 8    Mecca testified that, while standing at the front passenger door, he observed "a clear plastic cup with partial liquid," which Mecca suspected to be alcohol, on the floor near defendant's feet. Mecca could smell the odor of alcohol emanating from the vehicle. Mecca asked defendant for his identification. Defendant first identified himself as Dontaye L. Bradley, whom Mecca believed to be defendant's brother. Mecca provided that name to dispatch and requested an image. After receiving the image, Mecca was able to confirm that defendant had given an incorrect name. In the meantime, a canine positively alerted to the odor of narcotics coming from the vehicle. One of the officers recognized Hughes, who was now sitting behind defendant, as having an outstanding warrant. Hughes was the first individual removed from the vehicle. Mecca next asked defendant to exit the vehicle. When Mecca advised defendant that he believed that defendant had given an incorrect name, defendant provided Mecca with his true name.

¶ 9    Mecca testified that another officer searched defendant and recovered from his front left pants pocket a clear plastic bag containing 11 individually packaged pills, which Mecca believed

to be "ecstasy." The parties stipulated that the pills later tested positive for amphetamine. Mecca further testified that a search of the vehicle revealed a gun located under the front passenger seat and a half-empty bottle of Hennessey on the back right floorboard. Mecca identified People's exhibit No. 9 as a photograph of the bottle of Hennessey found in the vehicle.

¶ 10 Mecca testified that defendant was arrested and transported to the police station. At the time of the arrest, defendant was wearing "a blue jacket *** with a blue hood, a gray shirt underneath and a darker colored collar with white pants." Mecca identified People's exhibit No. 5 as a video recording of the booking room at the police station. Mecca identified defendant in the video and testified that defendant was wearing the same clothing that he was wearing when he was arrested. Mecca also identified Neal in the video, who can be seen wearing a gray hooded sweatshirt and gray sweat pants, which Mecca believed were identical to the clothing that Neal was wearing when arrested.

¶ 11                    B. The Search of the Vehicle and Discovery of the Gun

¶ 12 City of De Kalb police detective Sonny Streit testified that he arrived on the scene and saw Mecca standing at the front passenger window speaking with defendant. There were other individuals still in the vehicle. Streit searched the vehicle after all individuals had exited. Streit started his search on the front driver's side, where he located a small bag of cannabis in the cupholder and another in the center console. Streit then walked around the vehicle to search the front passenger side. Streit observed a small silver LG cellphone on the seat and two clear plastic cups, with an odor of alcohol emanating from them, on the floor. Streit testified: "As I drop down to look underneath the passenger seat I see what I believe to be a firearm." Streit stated: "I get down on one knee. I—I have gloves on at the time. I pull the firearm out from its location. I confirm that it is a firearm." Streit could not see the gun when he was standing outside of the passenger

door. Streit testified: "As I started to kneel I could see the very top of the firearm." His knee had not yet touched the ground when he saw the gun; he was "about halfway from standing to taking a knee." Streit stated: "[T]he front barrel, the very top of the gun was perfectly aligned with the front of the seat because as I'm standing there looking down I can't see it. As I kneel down about halfway I can see it." Streit testified:

> "I grabbed onto the firearm on the top. I pulled it out approximately six inches. I saw that, in fact, it did have a serial number, said 'Springfield' on the side .40 caliber of XD, and I left it where it was. I told Detective Mecca what I located. I made sure everyone was safely taken into custody and then I went back to the vehicle."

Streit testified that, after everyone was secured, about five minutes after he first discovered the gun, Streit "placed the firearm back to where it was before [he] moved it" and then photographed it. Streit did not change the orientation of the gun. Streit stated that he "put it back to the approximate spot where [he] saw it." Streit agreed that it was "an approximation," but he believed that it was "as close to" its original location as he thought. Streit also estimated that the passenger seat was about "two feet front to back."

¶ 13    Streit identified People's exhibit No. 10 as the photograph he took of "the front passenger side of the vehicle pointing at the floorboard showing what just [*sic*] barely under the seat where the firearm was." A portion of the gun can be seen in the photograph. Streit identified People's exhibit No. 11 as the photograph he took of the gun. The photograph shows the gun under the seat, with the barrel pointed toward the driver's side and the handle toward the back of the car. Streit identified People's exhibit No. 1 as the gun that he recovered from under the passenger seat. Streit testified that the gun was loaded with five bullets when it was recovered.

¶ 14              C. The Subsequent Investigation and Snapchat Evidence

¶ 15    Mecca testified that he interviewed defendant on the day of the arrest, shortly before 3 a.m. Defendant told him that the pills he possessed were "ecstasy pills." Defendant denied that he intended to sell them; defendant told Mecca that they were for him to share with his friends that evening to celebrate. When Mecca told defendant about the firearm found in the vehicle, defendant denied having any knowledge of it.

¶ 16    Mecca testified that he collected a gunshot residue sample from defendant's hands. Mecca did not receive results from the lab of the samples taken that night. When asked about whether he had the gun tested for fingerprints, Mecca responded:

> "I submitted—Officer Goodwin processed the gun for fingerprints. The gun—I believe the magazine and bullets, I submitted it to the Illinois State Police crime lab to see if there's any comparison with any of the five occupants and I received a report back that there was no comparison available for any of the five occupants in reference to the fingerprints that Officer Goodwin completed and that I submitted."

¶ 17    Mecca further testified that, later on the day of the arrest, he was contacted by Deidra Laseter, who told him that she was defendant's sister and that she had information about the traffic stop. When Mecca later met with Laseter, she told him that her friend Devonna Scott had provided her with a photograph that was on Neal's Snapchat account and a video that was on defendant's Snapchat account. Mecca explained that Snapchat is a "messenger application that individuals can send photos or videos and add filters to the videos, and the caveat of Snapchat is that after a certain amount of time these videos are be to [*sic*] purged and the messages are purged unless they're actually saved, so it's a mobile application." After viewing the photograph provided by Laseter, Mecca subsequently executed a search warrant of defendant's phone and of the Snapchat accounts belonging to defendant and Neal. Mecca identified People's exhibit No. 4 as the DVD containing

the images and videos obtained from Snapchat. The parties stipulated that the Snapchat account with the username "boss_dip" belonged to defendant and that the Snapchat account with the username "Lil Oochie" belonged to Neal.

¶ 18    Mecca identified two Snapchat videos showing defendant. The first was a video from Neal's Snapchat account. Mecca testified that the video showed a person's arm holding a bottle of Hennessey. According to Mecca, the clothing on the arm appeared to be similar to the clothing worn by Neal when he was arrested. Mecca testified that defendant can be seen sitting in the front passenger seat of what appeared to be Neal's vehicle holding a handgun that appeared to be identical to the handgun retrieved from the vehicle. Mecca testified that defendant was wearing clothing identical to the clothing that he was wearing when arrested and as shown in the booking video.

¶ 19    The second video was from defendant's Snapchat account. Mecca testified that the video showed: defendant, wearing the same jacket that he was wearing when arrested; Hughes, wearing a "rag on his head" similar to what he was wearing when arrested; and Neal, wearing the gray sweatshirt and sweatpants that he was wearing when arrested. Neal "appears as though he's waving the handgun that appears similar in size, shape and color" to the handgun that was recovered from the vehicle. (Neal can also be seen holding a bottle of Hennessey in his other hand.) A caption on the video reads: "my boii bday at 12," followed by several emojis. Mecca testified that Neal's birthday was on April 29, 1991.

¶ 20    Mecca testified to other videos that did not show defendant. Mecca testified to a video from Neal's account showing Neal holding what appeared to be a handgun and standing in front of an unidentified individual. Mecca also testified to a video from defendant's account showing Black with an unidentified person holding a gun.

¶ 21    Mecca also testified to photographs obtained from Snapchat. Mecca identified a photograph from Neal's Snapchat account showing a timestamp of "6:38 a.m." and a caption, that read: "Jus got out dey took my [car emoji] my [phone emoji] n my [gun emoji] n my homie free Dip." Mecca testified that the Snapchat file showed only the post's caption and time stamp. However, Laseter had earlier shown him a screenshot of this post, and her screenshot had the same timestamp and caption and also a photograph of Neal behind the caption. Mecca identified People's exhibit No. 20 as the screenshot that he obtained from Laseter. Mecca also identified a photograph from defendant's Snapchat account showing a bottle of Hennessy and a gun that appeared to be identical to the gun recovered from under defendant's seat and a photograph from Neal's Snapchat account showing a "Springfield XD40 which appears to be identical in shape, size and color to the firearm that was located under [defendant's] seat at the time of the arrest."

¶ 22    Mecca testified that this was his first time executing a search warrant with Snapchat. Except for the "6:38 a.m." post from Neal, Mecca was unable, despite his efforts, to locate time stamps or date stamps on any of the videos or photographs showing when they were created.

¶ 23    On cross-examination, Mecca testified that Hughes was arrested along with defendant. Mecca acknowledged that, when Hughes was released on the morning of April 29, 2017, he asked Mecca "either 'Can I get my gun—I mean my phone' or it was 'Can I get my gun—my phone back?', one of those, something to the effect of that where he did correct himself from saying 'my gun' to 'my phone.' " Mecca noted Hughes's statement in a report. Mecca also testified that he never saw defendant make any furtive movements. Mecca testified that Neal pleaded guilty to possessing the gun found in the vehicle.

¶ 24    The trial court found defendant guilty on all charges. The trial court denied defendant's subsequent motion to reconsider the finding of guilt or, alternatively, for a new trial. The parties

agreed that the convictions should merge into the armed violence conviction and that defendant should be sentenced on only that offense. Following a sentencing hearing, the court sentenced defendant to 17 years in prison, to be served at 50%, followed by a three-year term of mandatory supervised released. The court denied defendant's subsequent motion for reconsideration of his sentence.

¶ 25    This timely appeal followed.

¶ 26                                II. ANALYSIS

¶ 27    Defendant argues that he was not proved guilty beyond reasonable doubt of armed violence. "A person commits armed violence when, while armed with a dangerous weapon, he commits any felony defined by Illinois Law [with certain exceptions not relevant here]." 720 ILCS 5/33A-2(a) (West 2016). Defendant does not dispute that he committed a felony—unlawful possession of a controlled substance—or that the gun retrieved from under the front passenger seat was a dangerous weapon. Rather, defendant argues that the evidence was insufficient to prove that he was "armed" with the gun.

¶ 28    In reviewing a challenge to the sufficiency of the evidence, "the question is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "This standard of review applies in all criminal cases, whether the evidence is direct or circumstantial. [Citation.] Further, circumstantial evidence that meets this standard is sufficient to sustain a criminal conviction. [Citation.]" *People v. Jackson*, 2020 IL 124112, ¶ 64. The trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts to ultimate facts. *McLaurin*, 2020 IL 124563, ¶ 22. "In

reviewing the evidence, this court will not retry the defendant, nor will we substitute our judgment for that of the trier of fact." *Id.* We will not set aside a criminal conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985).

¶ 29    A person is "armed with a dangerous weapon," for purposes of the armed violence statute, "when he or she carries on or about his or her person or is otherwise armed with a [dangerous] weapon." 720 ILCS 5/33A-1(c)(1) (West 2016). Here, the State did not contend that defendant was carrying the gun on his person, so the question is whether defendant was "otherwise armed" (*id.*). To be "otherwise armed" means "having immediate access to or timely control over" the dangerous weapon. *People v. Harre*, 155 Ill. 2d 392, 396 (1993); *People v. Condon*, 148 Ill. 2d 96, 110 (1992). To be "otherwise armed" also requires that a defendant have knowledge of the presence of the weapon. See *People v. Adams*, 265 Ill. App. 3d 181, 186 (1994) (finding that the defendant's knowledge was reasonably inferred from the fact that the defendant was wearing the garment in which the weapon was found). Defendant argues that the State failed to prove beyond a reasonable doubt that he had knowledge of the presence of the gun located under the passenger seat or that he had immediate access to it during his interactions with Mecca.

¶ 30    In arguing that the evidence was insufficient to prove his knowledge of the gun's presence, defendant relies on *People v. Thomas*, 242 Ill. App. 3d 266, 276-77 (1993), and *People v. McKnight*, 39 Ill. 2d 577, 580-81 (1968).  At issue in *Thomas* was whether the defendant was armed during a drug transaction that involved drugs located in a car several parking spaces away from the Oldsmobile in which defendant was seated. *Thomas*, 242 Ill. App. 3d at 276-77. In finding that the defendant was armed, we specifically noted his codefendant's testimony that the defendant knew there was a gun behind the armrest of the Oldsmobile where defendant had remained during

the transaction. *Id.* at 276. In *McKnight*, the supreme court found that the circumstantial evidence was sufficient to prove knowledge, where the defendant "made motions with his right hand and a dipping motion of the shoulder prior to being stopped; his companion was armed; and the pistol was found loaded under [the defendant's] seat." *McKnight*, 39 Ill. 2d at 581. As defendant correctly observes, unlike in *Thomas*, none of the individuals in the car testified to defendant's knowledge of the gun. Likewise, defendant made no furtive movements suggesting his knowledge of the gun as in *McKnight*.

¶ 31    The State counters that the Snapchat evidence, along with how defendant was situated vis-à-vis the gun, circumstantially proves that defendant had knowledge of the gun.  Defendant argues that the circumstantial evidence here is insufficient. We disagree.

¶ 32    Here, based on the Snapchat evidence and the location of the gun, a rational trier of fact could have reasonably inferred that defendant knew that the gun was under the passenger seat where he was sitting. The video from Neal's Snapchat account showed the arm of an individual wearing a gray sweatshirt, whom Mecca reasonably believed to Neal, holding a bottle of Hennessey. That same video also showed defendant, wearing the identical clothing that he was wearing at the time of his arrest, sitting in the front passenger seat of what Mecca reasonably believed to be Neal's vehicle, and holding a gun that appeared to be identical to the gun retrieved from under the front passenger seat. The video from defendant's Snapchat account showed defendant, Hughes, and Neal, again wearing the same clothing they were wearing when arrested. Neal was holding a bottle of Hennessy and a gun that appeared to be identical to the gun retrieved from under the front passenger seat. A caption on the video read: "my boii bday at 12," followed by several emojis. Mecca testified that Neal's birthday was on April 29, 1991. Even though Mecca was unable to provide an exact time or date for the Snapchat videos, a rational trier of fact could

have reasonably inferred that the videos were made in the hours leading up to the arrest, given that the parties were wearing the same clothing, an identical gun was found under the front seat, a half-empty bottle of Hennessy was found in the back seat, and the caption provided that Neal's birthday was at midnight.

¶ 33    In addition to the Snapchat evidence, Streit's testimony established that the gun was found under the passenger seat at the very front of the seat where defendant was sitting. Streit explained that he could not see the gun while he was standing but that as he "started to kneel [he] could see the very top of the firearm." He stated that "the front barrel, the very top of the gun was perfectly aligned with the front of the seat." Streit identified the photographs he took of the gun's location under the passenger seat. Defendant disputes that the gun was found " 'well forward,' " as described by the State. According to defendant, Streit had to pull it out by six inches to confirm it was a handgun. To be sure, Streit acknowledged that he moved the gun and then photographed it after he returned it to its "approximate" location. However, Streit explained that he placed the gun as close as possible to its original location. Further, Streit's testimony was unequivocal that when he first saw the gun the top of the barrel "was perfectly aligned with the front of the seat," which supports a reasonable inference that the gun was placed there by defendant. The fact that Streit pulled the gun out six inches to see it does not mean that the gun was not as he described it when he first discovered it—with "the very top of the gun *** perfectly aligned with the front of the seat."

¶ 34    Defendant argues that the evidence supports a finding that "either Hughes or Neal, who both later claimed ownership of the gun, placed the gun under the front passenger seat at the point when Mecca's attention is elsewhere." Defendant points to the photograph from Neal's Snapchat account stating that his gun had been taken and to Mecca's testimony that, after the arrest, Hughes

asked Mecca when he was getting his gun back. Of course, even if Hughes owned the gun, this fact does not preclude a determination that defendant knew the gun was there. Moreover, given (1) where Neal and Hughes were sitting in the back of the vehicle, (2) where the gun was found, and (3) the extremely brief period that defendant and Black were outside of the vehicle, a rational trier of fact could have readily inferred that neither Neal nor Hughes placed the gun there while Mecca was directing defendant and Black into the vehicle while it remained in Mecca's peripheral vision. We reject too defendant's argument that the orientation of the gun, with the barrel pointed toward the driver and the handle pointed toward the back, made it "unlikely" that defendant placed it under the seat. Defendant could have placed the gun under the seat in several different ways and its orientation was not inconsistent with defendant placing the gun under the seat. Indeed, the location of the gun, with its barrel at the front of the two-foot-deep passenger seat, made it less likely that Hughes or Neal placed it there. Moreover, that Mecca stated he did not see defendant make any furtive movements before exiting the vehicle certainly can be considered by the jury, but standing alone does not create a reasonable doubt.

¶ 35    Next, having determined that the circumstantial evidence was sufficient to allow a rational trier of fact to conclude beyond a reasonable doubt that defendant had knowledge of the gun, we consider whether the evidence was sufficient to prove beyond a reasonable doubt that defendant had "immediate access to" the gun. See *Harre*, 155 Ill. 2d at 396; *Condon*, 148 Ill. 2d at 110. In *Harre*, the supreme court held that the defendant, standing next to a vehicle with a partially opened window, had immediate access to weapons located on the front seat, where officers' opined that defendant could have reached the guns. *Harre*, 155 Ill. 2d at 396-97. In *Condon*, the supreme court held that the defendant did not have immediate access to weapons, because the defendant was found in the kitchen, where there were no guns, and the weapons were in various locations

throughout the house. *Condon*, 148 Ill. 2d. at 109-110. The court found that the weapons were "too far removed from the defendant" (*id.* at 110) and that he "did not have the capability to maintain control and possession of guns that were not even in the same room with him" (*id.* at 112).

¶ 36    Here, as noted, the gun was located underneath the passenger seat aligned with the front of the seat. It is clear that defendant, who was sitting in the passenger seat, had immediate access to the gun, as he would have had little difficulty reaching down, grabbing the weapon, and taking control of it as Mecca approached the vehicle. See *People v. Scott*, 2011 IL App (2d) 100990, ¶ 30 (finding the defendant guilty of armed violence where, when the police arrived, he was lying on a couch, a foot or two away from a love seat under which he had placed a shotgun; the defendant "would have had little difficulty getting up, reaching for the gun, and taking control of it as the doors of the apartment opened").

¶ 37    We reject defendant's argument that, because Streit "could only provide the approximate location of the gun," the evidence does not establish beyond a reasonable doubt that the gun was readily accessible to defendant. First, as noted, Streit testified unequivocally about where the gun was located before he moved it. That the photograph of the gun's location was taken by Streit after he moved it and returned it to its approximate location does not negate Streit's testimony. Nor is defendant's reliance on *People v. Melgoza*, 231 Ill. App. 3d 510 (1992), of any avail.  In *Melgoza*, the reviewing court found that the evidence failed to prove that the gun was readily accessible to the defendant, who was in the front seat of a vehicle, because the officer who testified at trial did not personally recover the gun, knew only that the gun was recovered " 'from the back seat' " of the vehicle, and "did not know if the gun was located under the back seat or in the trunk compartment." *Id.* at 532. Here, Streit personally recovered the gun and testified to its original location, where it was readily accessible and within defendant's reach.

¶ 38    Based on the foregoing, we cannot say that the evidence was so improbable or unsatisfactory that it created a reasonable doubt of the defendant's guilt.

¶ 39                                    III. CONCLUSION

¶ 40    For the reasons stated, we affirm the judgment of the circuit court of De Kalb County.

¶ 41    Affirmed.