2025 IL App (1st) 231116

No. 1-23-1116

Fifth Division
September 26, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 22 CR 03554 01 |
| | ) | |
| JYWAUN WELCH | ) | The Honorable |
| | ) | James M. Obbish, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE TAILOR delivered the judgment of the court, with opinion.
Justice Gamrath concurred in the judgment and opinion.
Justice Hyman dissented, with opinion.

**OPINION**

¶ 1    Following a bench trial, defendant Jywaun Welch was convicted of unlawful use or possession of a weapon by a felon (UPWF) and four counts of aggravated unlawful use of a weapon by a felon (AUUW) and was sentenced to seven years' imprisonment. He appeals from his convictions, arguing (1) the State failed to prove him guilty beyond a reasonable doubt, (2) the trial court improperly admitted evidence, (3) the trial court was biased against him and interfered with right to confront witnesses, and (4) the UPWF statute is unconstitutional on its face and as applied to him because it violates the second amendment. We affirm.

¶ 2                              I. BACKGROUND

¶ 3      At trial, Officer Noel Rodriguez testified that, on February 27, 2022, while on patrol, he saw that the driver and passenger of a nearby car were not wearing their seat belts. He and his partner curbed the car. When Rodriguez approached, he noticed "a strong odor of cannabis." The driver, Tequaria Flatey, produced an identification card but not a driver's license. The front-seat passenger, Welch, was eating chicken from a box. Rodriguez did not see Welch reach under the seat or attempt to hide anything.

¶ 4      Rodriguez ordered them out of the car. Rodriguez looked into Flatey's open purse and saw cannabis. Rodriguez testified that Welch appeared nervous because his hand was "visibly shaking," and he was sweating, even though it was February. Rodriguez searched the car and found a firearm "right underneath the passenger seat *** not tucked all the way underneath the seat," but "flush with the front of the seat." He identified People's exhibit 1 as the gun he had found: a Glock 17 with an extended magazine and a "brown handle." Welch was handcuffed behind his back. Rodriguez then retrieved the gun from the car.

¶ 5      The State published and played a portion of a video recorded by Rodriguez's bodycam camera. There was no objection by Welch. In the body-cam video, Flatey is heard saying that she had a firearm owner's identification (FOID) card but did not own any weapons. At the end of the video, Rodriguez is seen unloading the gun near the passenger seat of a police car. The Glock seen in the bodycam video is black with a black grip, and there is light brown backstrap on the back of the grip.

¶ 6      Rodriguez interviewed Welch twice at the police station. The first interview was recorded on his bodycam video. The second was not. During the second interview, Rodriguez confronted Welch with a music video called "Chicken Heads," which was uploaded to YouTube in 2022 two

months before this arrest. Rodriguez did not know when the video was filmed. Welch identified himself in the music video but denied that one of the guns he was holding in the video was the same gun found in Flatey's car.

¶ 7 The State moved to admit the music video as evidence. Welch objected to the music video as evidence of other crimes and unfairly prejudicial. The trial court overruled the objection, finding that the video was not being offered for evidence of other crimes but rather to show Welch's possession of a weapon in the video was probative of his knowledge of same weapon found under his seat in this case.

¶ 8 The State published and played the music video. Rodriguez identified it as the video in which Welch identified himself and testified that a still frame showed Welch holding a black firearm with a "brown handle."

¶ 9 The State presented certified copies of Welch's juvenile adjudication for armed robbery in case No. 18-JD-00565 and conviction for aggravated unlawful use of a weapon in case No. 19-CR-0445801. The parties stipulated that Welch did not possess a valid FOID card or valid concealed carry license.

¶ 10 The trial court denied Welch's motion for a directed finding.

¶ 11 In defense, Welch presented two stipulated facts. First, an officer would testify that he examined the recovered gun and found a ridge impression located on the rear side of the lower receiver of the firearm. Second, a latent print examiner would testify that he determined that the ridge impression was unsuitable for identification. Welch waived his right to testify.

¶ 12 The trial court continued the case for closing arguments, and defense counsel then sought leave to reopen the case to call the second officer. The court instructed her to file a motion. On the next court date, Welch refused to appear on Zoom. The court continued the case again for closing

argument. At the next court hearing, the court offered defense counsel the opportunity to reopen the defense. She declined. During closing arguments, the State played the music video and argued that one of the guns in the music video was "identical" to the recovered gun.

¶ 13    The court found Welch guilty stating,

"The distinction is that now we know what he was holding in the [music] video because it's the same gun that I'm holding in my hand now. It's very distinguishable. And the defendant voluntarily chose to publically [*sic*] display himself holding the same gun that they find under the car seat. The defendant made choices.

I don't find it a coincidence that somehow the same gun is in the [music] video with—clearly it's him. I mean, all one has to do is look at the [music] video, the person depicted in there, look at the defendant and you could see it's the same person. And you could see that it's the same gun and now we know it's a real gun. It's not a prop. It's a real gun with real bullets."

¶ 14    Welch moved for a new trial, arguing that the trial court erred by admitting the music video, abandoning its role as a neutral arbiter, and finding the gun in the music video was real and the same gun that officers recovered. He attached stock photos of air pistols, including a Glock 17 air pistol and stills from the music video.

¶ 15    The trial court denied the motion and sentenced Welch to seven years in prison.

¶ 16                                    II. ANALYSIS

¶ 17    Welch first contends the State failed to prove beyond a reasonable doubt that he possessed the loaded gun.

¶ 18 When faced with a challenge to the sufficiency of the evidence, we must determine whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Smith*, 185 Ill. 2d 532, 541 (1999). The trial court, not the reviewing court, "remains responsible for making determinations regarding the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence." *People v. Wright*, 2017 IL 119561, ¶ 70. A defendant's conviction will be overturned based on the sufficiency of the evidence only where it is "so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of the defendant's guilt." *Id.*

¶ 19 To prove Welch guilty of UPWF, the State was required to prove that he possessed a firearm after being convicted of a felony. 720 ILCS 5/24-1.1(a) (West 2022). In this case, the parties stipulated to Welch's prior felony conviction. The only contested issue is whether Welch possessed the loaded gun.

¶ 20 Possession may be actual or constructive. *People v. Brown*, 327 Ill. App. 3d 816, 824 (2002). "Constructive possession exists where there is no actual, personal, present dominion over contraband, but defendant had [(1)] knowledge of the presence of the contraband, and [(2)] had control over the area where the contraband was found." *People v. Hunter*, 2013 IL 114100, ¶ 19; *People v. Davis*, 2021 IL App (3d) 180146, ¶ 72. Welch disputes both elements.

¶ 21 The State proves control by showing that a defendant had the intent and capability to exercise dominion over the area where the gun was found. *People v. Jackson*, 2019 IL App (1st) 161745, ¶ 27. Among other things, courts may consider a defendant's ability to access the item. *People v. O'Neal*, 35 Ill. App. 3d 89, 91 (1975) (rational to infer control of item within defendant's reach).

¶ 22    Officers pulled Flatey over and soon ordered her and Welch, the front-seat passenger, out of the car. In the bodycam video, Officer Rodriguez is seen reaching under the front passenger seat and retrieving a gun. Given this, the trial court could have inferred Welch's control over the gun. Welch's ability to access the firearm established his control over it. The gun was "right under the passenger seat *** close to the front end of the seat." While seated, Welch could have reached down and retrieved the gun. Thus, the trial court could have reasonably inferred that Welch had control over it. *Id.*

¶ 23    Welch next contends his presence in the car was not proof that he knew the gun was under the passenger seat. Indeed, a defendant's presence in a car, without more, is insufficient to establish that he knew a weapon was in the car. *People v. Bailey*, 333 Ill. App. 3d 888, 891-92 (2002). However, knowledge may be inferred from the following factors: "(1) the visibility of the weapon from defendant's position in the car, (2) the period of time in which the defendant had an opportunity to observe the weapon, (3) any gestures by the defendant indicating an effort to retrieve or hide the weapon, and (4) the size of the weapon." *Id.* However, "[t]he *Bailey* factors do not *** constitute the *exclusive* means for determining whether a vehicle occupant knew that contraband was present." (Emphasis in original.) *People v. Spears*, 2022 IL App (1st) 201290-U, ¶ 45. Rather, courts should also consider any other relevant circumstantial evidence of knowledge. *Bailey*, 333 Ill. App. 3d at 892. Knowledge may be demonstrated by evidence of a defendant's acts or conduct from which one can infer that he knew the contraband existed in the place it was found. *People v. Spencer*, 2012 IL App (1st) 102094, ¶ 17. Knowledge and possession are factual questions to be resolved by the trier of fact. *People v. Smith*, 2015 IL App (1st) 132176, ¶ 25.

¶ 24    Applying the specific *Bailey* factors and viewing the other circumstantial evidence in the light most favorable to the State, a rational trier of fact could have found that Welch knew the

firearm was under the passenger seat where he was sitting. First, Officer Rodriguez testified that the gun was found "flush" or even with the front of the passenger seat and not in a difficult to access location. Officer Rodriquez's bodycam video shows that although Welch was eating chicken when the officers approached the vehicle on foot, the chicken was in a small box perched high on his lap and did not obscure Welch's view of the floor.

¶ 25    With respect to the second and third factors of the test, there is no evidence in the record pertaining to the amount of time that the defendant was in the car. There is also no evidence that Welch made any furtive movements in an effort to retrieve or hide the gun. Accordingly, these factors do not assist us in determining whether Welch's knowledge of the gun can be inferred.

¶ 26    Regarding the fourth factor, the gun recovered from under the passenger seat was not small. The video from Officer Rodriquez's bodycam shows that he recovered a gun of substantial size with a long magazine clip attached. The trial court examined the gun in his hands. It had distinctive features, including a brown backstrap, silver slide lock, curvature on the trigger guard, thumb rest, slide serrations on the barrel, and grip texture on the handle. Still photographs of the gun taken from the officer's bodycam video show the same. The size and distinctive nature of the gun weigh in favor of Welch's knowledge of the gun under the seat.

¶ 27    In addition to the *Bailey* factors, there are two other pieces of circumstantial evidence to support Welch's knowledge. First, Flatey, the driver and owner of the vehicle, can be heard on the bodycam video saying that she had a FOID card but did not own any weapons. Second, the gun recovered from under Welch's seat in Flatey's car appears to be the same gun Welch had in his hand in his "Chicken Heads" music video posted on YouTube two months before Welch was arrested. During his interview with Officer Rodriguez, Welch admitted that he appears in the music video holding a gun. A side-by-side comparison of screenshot photos of the gun from Officer

Rodriguez's bodycam video and the "Chicken Heads" music video shows the guns have the same brown backstrap, silver slide lock, curvature on the trigger guard, thumb rest, slide serrations on the barrel, and grip texture on the handle:



¶ 28    This was a bench trial. In a bench trial, the judge is the trier of fact and assigns weight to the testimony, resolves conflicts in the evidence, and draws reasonable inferences from the evidence. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). It is not our role to retry the defendant. *People v. Gray*, 2017 IL 120958, ¶ 35. We will reverse a criminal conviction only when the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Rowell*, 229 Ill. 2d 82, 98 (2008).

¶ 29    The State admitted the gun recovered from under Welch's seat into evidence at trial. The court, as the trier of fact, was able to compare the gun, a three-dimensional object, with the gun Welch was holding in the music video. The judge had the gun in his hands and was able to manipulate it and hold it in different ways for comparison. See *People v. Gilbert*, 68 Ill. 2d 252,

260 (1977) (examination of the gun itself could properly assist the judge during his deliberation). When denying Welch's posttrial motion, the trial court compared the recovered gun with a still photo from the music video and found: "It has exactly the same colorations, the same markings. Everything is the same." Even if another judge or jury may have determined that the gun found under Welch's seat was not the same gun Welch held in his hand in the music video, it is simply not possible to conclude that *no reasonable trier of fact* could have found that the gun was the same, particularly where our determination on review is based solely on photographs of evidence.

¶ 30    Nevertheless, Welch argues that no physical evidence, such as DNA or fingerprints, linked him to the firearm. However, as noted, circumstantial evidence alone is sufficient to sustain a conviction. See *Bailey*, 333 Ill. App. 3d at 891. "Physical evidence linking [the] defendant with the firearm is not required to establish that he committed the offense." *People v. Bobo*, 2020 IL App (1st) 182628, ¶ 43.

¶ 31    This case is similar to *People v. Bradley*, 2021 IL App (2d) 190009-U, where the defendant was a front seat passenger in a car stopped for a traffic violation. *Id.* ¶ 7. Upon searching the vehicle, the officers found a gun under the front passenger seat. The State admitted two Snapchat videos recorded the same day as the defendant's arrest, one taken from the driver of the vehicle's phone showing the defendant sitting in the front passenger seat of what appeared to be the same vehicle "holding a handgun that appeared to be identical to the handgun retrieved from the vehicle" and one posted on the defendant's Snapchat account that showed the defendant and the other occupants of the vehicle wearing the same clothes they were wearing during the traffic stop. *Id.* ¶¶ 18-19, 32. The defendant was convicted of armed violence and appealed.

¶ 32    On appeal, the defendant argued that the State failed to prove him guilty beyond a reasonable doubt because it failed to establish that he knew the gun was under the passenger seat

or that he had immediate access to it. *Id.* ¶ 27. The Second District of this court found that a rational tried of fact could have inferred from the Snapchat videos and the location where the gun was found that the defendant had knowledge of the gun. *Id.* ¶ 31-32. In particular, the court further found that the location where the gun was found—"at the very front of the seat where defendant was sitting," " 'perfectly aligned with the front of the seat,' "—supported a reasonable inference that the defendant placed the gun there and therefore had knowledge of it. *Id.* ¶ 33.

¶ 33    Here, Welch's "Chicken Heads" music video was posted in 2022, within two months of his arrest, and the gun Welch is holding in the music video and the gun recovered from under the passenger seat in the car look identical. That there was no evidence presented that showed when or where the music video was created is of no consequence. Welch admitted that he appeared in the music video holding the gun. Although the timing is different in this case than in *Bradley*, the temporal proximity is still a factor that the court could properly consider in determining whether Welch had knowledge of the gun. The *Bradley* court did not establish a bright line rule that says a video or photo showing a person with contraband has to be taken that day or that week rather than two months or two years ago. To the contrary, the temporal proximity is a matter of weight to be given to the evidence. Hence, like the defendant in *Bradley*, the trial court could have rationally found that Welch had knowledge of the gun. Accordingly, taking all five pieces of circumstantial evidence together, we find the State proved Welch's knowledge beyond a reasonable doubt. We therefore reject Welch's claim of insufficient evidence to prove his guilt.

¶ 34    Welch next argues that the trial court abused its discretion by allowing the State to introduce the "Chicken Heads" music video showing him brandishing a firearm because the video constituted other crimes evidence and was more prejudicial than probative. The State responds that the video was not admitted as evidence of other crimes and that Welch has failed to establish how

the video, which showed him holding a gun and rapping, amounts to other crimes evidence.

¶ 35    Evidence is relevant if it has any tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Ill. R. Evid. 401 (eff. Jan. 1, 2011). Evidence is generally admissible if it is relevant. *People v. Pikes*, 2013 IL 115171, ¶ 21. Relevant evidence tends to make the question of guilt more or less probable. *People v. Thomas*, 2020 IL App (1st) 170310, ¶ 37; Ill. R. Evid. 401 (eff. Jan. 1, 2011). However, relevant evidence is inadmissible if the danger of unfair prejudice substantially outweighs its probative value. Ill. R. Evid. 403 (eff. Jan. 1, 2011). " 'It is within the discretion of the circuit court to decide whether evidence is relevant and admissible, and a reviewing court will not disturb the circuit court's decision absent a clear abuse of that discretion.' " *People v. Anderson*, 2024 IL App (1st) 200462-B, ¶ 180 (quoting *Peach v. McGovern*, 2019 IL 123156, ¶ 25). An abuse of discretion occurs "where no reasonable person would take the position adopted by the circuit court." (Internal quotation marks omitted.) *Id.*

¶ 36    Here, the State moved to admit the music video into evidence and defense counsel objected arguing that the video was inadmissible because it showed, *inter alia*, Welch with a firearm, making it other crimes evidence. The State responded that the video was an admission by party opponent because Welch identified himself in it, holding a firearm. The court ruled that the video was not other crimes evidence because Welch's possession of a weapon in the video was probative of his possession of the firearm recovered from the car, and that the State properly notified Welch of the video. The video was admitted and the State published and played the video.

¶ 37    Even if, as Welch suggests, "the imagery of Welch posing with firearms and pointing them at the camera in a rap music video in which Welch uses vulgar, offensive language, including racial and gender slurs" depicted other crimes evidence, which we do not think it does, the record

clearly establishes that the video was not offered by the State as other crimes evidence, nor was it received by the court as other crimes evidence. The court stated:

> "Your objection to it is certainly valid with respect to the weight that the Court should give to the video, but this is not other crimes evidence. The State is not trying to convict him of possession of this weapon, Exhibit No. 1, by showing a video which they are going to at least argue to the Court is the video of him holding it. I don't know what It's going to show exactly but somehow that would relate to his possession. I don't view this as other crimes evidence.
>
> The Defense was given, from what I can tell, all of the information ahead of time as to what the State's theory of the case was. Obviously there—there seems to be that because the defendant presumably or allegedly possessed State's Exhibit No. 1 on some other date and recorded it then that would go towards establishing his possession of the weapon on February 27, 2022."

Later at the hearing on posttrial motions, the court stated:

> "There was arguments made at the time of the trial at the time the video was first proffered and that was for the first time, arguments being made by the defense that they were—this evidence should have been the subject of a State motion to have it admitted because it was being offered for proof of other crimes. And I think that's where there is sort of the big fracture in I think reality here from my perspective.
>
> It wasn't being offered by the State to show that the defendant committed another crime. It was being offered to show that the defendant committed the crime that he was charged with.

*** 

So this wasn't proof of other crimes. It was proof of this crime. Because how in the world does a person who has no idea maybe that there's a gun underneath the seat of the car he happens to be a passenger in, oh, by the way, what a coincidence, he just happens to have allowed himself to be videotaped holding the same weapon."

¶ 38     This was a bench trial. The trier of fact assessed the credibility of the witnesses, determined the appropriate weight of the testimony and resolves conflicts or inconsistencies in the evidence. *People v. Naylor*, 229 Ill. 2d 584, 614 (2008) (Thomas, C.J., dissenting). It is fundamental that a fair bench trial is one based on the consideration of only that evidence introduced at trial and reasonable inferences to be drawn therefrom. *People v. Nelson*, 246 Ill. App. 3d 824, 830 (1993). Further, in a bench trial it is presumed that the trial court considered only relevant evidence and that presumption may be rebutted when the record affirmatively shows the contrary. *People v. Simon*, 2011 IL App (1st) 091197, ¶ 91.

¶ 39     The court ruled that the video was relevant to determine Welch's knowledge of the firearm under the seat. There is no contrary proof here that the trial court considered the relevant evidence for any purpose other than the one he stated on the record. In addition, the fact that the court did not conduct a general balancing test between the probative and prejudicial nature of the video on the record does not mean the court did not balance those competing interests. See *People v. Casillas*, 195 Ill. 2d 461, 486 (2000) (finding that while the trial judge did not expressly articulate she was balancing the probative value of the defendant's prior convictions against their prejudicial impact, it was evident from the transcript the trial judge followed the law). The record in this case demonstrates that the trial court listened to arguments from the parties, which included defense counsel's argument regarding the prejudicial effect of the video being entered into evidence. The

trial court then issued a ruling allowing the evidence as proof of Welch's knowledge of the firearm under the seat. While not articulated on the record, the court clearly engaged in a meaningful assessment of the evidence before determining its admissibility. See *People v. Donoho*, 204 Ill. 2d 159, 186 (2003) (a trial judge should engage in a "meaningful assessment of the probative value versus the prejudicial impact of the evidence" in the context of other crimes evidence). We therefore find that no abuse of discretion occurred here. The subject music video showed Welch in possession of a firearm that had "identical" markings, coloring, "everything," as the firearm recovered from underneath Welch's seat in the car. Because the issue of whether Welch had knowledge of the gun was probative of his possession of it, the video was relevant. That others may have reached a different result does not render the trial court's decision erroneous. *People v. Chapman*, 262 Ill. App. 3d 439, 461 (1992) ("A reviewing court may not simply substitute its judgment for that of the trial court on a matter within the trial court's discretion.").

¶ 40 Welch next argues that the trial court's bias against defense counsel denied him a fair trial. Welch points to comments the court made during his counsel's cross-examination of the State's only witness on a core aspect of the State's evidence and in its ruling to deny his motion for a new trial.

¶ 41 A trial judge is presumed to be impartial, and the burden of overcoming this presumption rests on the party making the charge of prejudice. *Eychaner v. Gross*, 202 Ill. 2d 228, 280 (2002). Allegations of judicial bias or prejudice must be viewed in context and should be evaluated in terms of the trial judge's specific reaction to the events taking place. *People v. Jackson*, 205 Ill. 2d 247, 277 (2001). A judge's display of displeasure or irritation with an attorney's behavior is not necessarily evidence of judicial bias against the defendant or his counsel. *Id.* At the same time, it is "the trial court's responsibility to achieve prompt and convenient dispatch of court proceedings."

*People v. Faria*, 402 Ill. App. 3d 475, 479 (2010). We review *de novo* the question of whether the trial judge's conduct requires reversal of the judgment. See *People v. McLaurin*, 235 Ill. 2d 478, 485 (2009).

¶ 42    Welch points to several statements made by the court during trial and at the hearing on his motion for new trial where "the trial judge was impatient and discourteous." For example, after defense counsel asked Officer Rodriguez whether the defendant was a "musical artist" in the YouTube video, the court responded:

> "He is not an expert witness on films. He is not going to be testifying at the Academy Awards or music awards or anything else. It speaks for itself *** he is a Chicago Police officer testifying about what he did that day*** So don't try to make the officer some sort of expert witness *** when he is not called as an expert witness."

When viewed in context, the record makes clear that this comment followed multiple prior admonishments from the court instructing counsel to lay a proper foundation and avoid improper questioning.

¶ 43    Later, when defense counsel asked whether Officer Rodriguez had been present at the time the video was recorded, and began her question with, "Officer, you don't know," the court again interjected, stating the question was "argumentative" and reminded counsel against further improper questions yet defense counsel continued to question Officer Rodriguez about his knowledge of the making of the video and asked him, "You weren't present when this was recorded, correct? Correct?" After being interrupted by counsel twice, the court informed defense counsel:

> "[Y]ou had best calm yourself down and [*sic*] moment and listen to what I'm saying. He is not here as an expert witness, and actually, because you interrupted me you

made me lose my train of thought about what I was going to tell you about something here, and I don't like that. I don't like the position that you put me in where I get sort of upset***don't argue with me here in the courtroom while I'm trying to make a statement, especially by interrupting me. It's unprofessional, inappropriate, and I expect a lot more of you.

[Y]ou're not going to advance your cause—your client's cause by asking questions that are so ridiculous as—to this officer that, oh, you were not present when it was recorded. That is argumentative. If you want to make that point later on in our argument that's fine.

I got a hunch. I just have a little bit of a hunch that [the prosecutor] would have brought out the fact that he was there and saw the defendant waving a gun around at the time the video was made. That might have come up. It might have come up in direct examination. So asking ridiculously silly questions in front of me just drives me crazy because it doesn't advance what we're trying to do during the course of litigation. Don't fall victim to that. This is not a bunch of kids playing let's play lawyer, let's play courtroom, let's play trial, let's play cops and robbers, let's do that. This is the real world here. So take a breath, compose yourself, and ask appropriate questions. Proceed. And that last question about whether he was there that's not an appropriate question. So ask a different one."

¶ 44    While perhaps stern, the court's comments merely reflect what was already obvious to it, that Officer Rodriguez was not present when the "Chicken Heads" music video was made. At the same time, the court was exercising control over the proceedings by attempting to redirect counsel to more pertinent questions. While the court displayed some irritation with defense counsel, the court's comments do not evidence judicial bias. *People v. Urdiales*, 225 Ill. 2d 354, 426 (2007) (a trial court's irritation with defense counsel is not necessarily evidence of judicial bias).

¶ 45    The court explicitly encouraged counsel to "compose [herself] and ask appropriate questions" and provided instructional guidance throughout the cross-examination. Significantly, posttrial proceedings, the trial court expressed respect for counsel's efforts: "I appreciate your hard efforts on behalf of your client. I respect you greatly for that advocacy." This directly undermines the claim of personal animus or bias. Judicial criticism of counsel's conduct, especially when directed at adherence to rules of evidence or courtroom decorum, does not support a finding of bias. *People v. Barnes*, 2017 IL App (1st) 143902, ¶ 70; *In re Estate of Wilson*, 238 Ill. 2d 519, 554 (2010) (A judge's opinions formed during the course of trial proceedings do not establish bias unless they display a deep-seated favoritism or antagonism.).

¶ 46    Even assuming *arguendo* that some of the court's comments were ill-advised, reversal is not warranted unless the conduct was a material factor in the conviction or created a substantial risk of prejudice. *People v. Lopez*, 2012 IL App (1st) 101395, ¶ 57. In bench trials, prejudice is only shown where the trial court prejudged the evidence or rendered judgment before hearing all the facts. *People v. Holland*, 2023 IL App (4th) 220384, ¶ 41. Welch makes no such arguments here.

¶ 47    We likewise reject Welch's argument that the court impeded defense counsel from continuing the cross-examination or impeachment of Officer Rodriguez. The confrontation clause (U.S. Const., amend. VI) guarantees the opportunity for effective cross-examination, not "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985); *People v. Jones*, 156 Ill. 2d 225, 243-44 (1993). Trial courts have broad discretion to impose reasonable limits to prevent harassment, confusion, or repetitive questioning. *People v. Blue*, 205 Ill. 2d 1, 13-14 (2001); *People v. Meyers*, 2018 IL App (1st) 140891, ¶ 50.

¶ 48    Defense counsel cross-examined Officer Rodriguez extensively. She questioned him on the traffic stop, including details about the weather, Welch's behavior, the location of the firearm, the contents and timing of the body-worn camera footage, his identification of the firearm in the video, and his interpretation of the video's contents. The record shows that the trial court allowed counsel to pursue her theory and did not limit the scope or duration of her examination. The court only intervened to restrict argumentative and improper questioning, a permissible exercise of discretion. *Faria*, 402 Ill. App. 3d at 479.

¶ 49    Welch's reliance on *People v. Greer*, 293 Ill. App. 3d 861 (1997), is misplaced as the facts there are not remotely similar. At the defendant's murder trial, defense counsel attempted to cross examine a State's witness regarding his motive to lie based on the State having financed his move out of the neighborhood where the murder occurred, trying to bring out that the witness had wanted to move for some time but was unable because of financial reasons and he had not paid real estate taxes in two years. *Id.* at 863-64. The trial court refused to let the defendant continue his line of questioning and characterized it as "ridiculous" before the jury. *Id.* On appeal, we found that the circuit court erred when it did not allow the cross-examination that would have allowed the defendant to develop a theory of impeachment that the "help [the witness] received from the State was sufficient to induce him to implicate the defendant in the victim's death." *Id.*

¶ 50    Here, the court did not curtail defense counsel's cross-examination of Officer Rodriguez, nor did the court prevent Welch from exploring his theory of defense. In addition, the court did not prohibit any inquiry into witness bias, credibility, or the foundation of the State's evidence. The court simply restricted defense counsel from asking argumentative and repetitive questions. As Welch readily admits, "none of this is to say that all of defense counsel's questions on cross examination were properly formed."

¶ 51    Finally, Welch argues his conviction should be reversed because the UPWF statute (720 ILCS 5/24-1.1(a) (West 2022)) violates the second amendment (U.S. Const., amend. II), as the State has failed to provide a historical analogue for the "permanent status-based revocation" of the right to keep and bear arms.

¶ 52    The second amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. The United States Supreme Court has held that the second amendment, applied to the States through the fourteenth amendment (U.S. Const., amend. XIV), protects the right of "an ordinary, law-abiding citizen" to possess a handgun in the home and carry a handgun outside the home for self-defense. *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 8-10 (2022); see *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008) ("[The Second Amendment] surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home."). The *Bruen* court held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17. In order to justify regulating such presumptively protected conduct, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

¶ 53    Welch challenges the constitutionality of the UPWF statute, which provides:

"It is unlawful for a person to knowingly possess on or about his person or on his land or in his own abode or fixed place of business any weapon prohibited under Section 24-1 of this Act or any firearm or any firearm ammunition if the person has been convicted of a felony under the laws of this State or any other jurisdiction." 720 ILCS 5/24-1.1(a) (West 2022).

¶ 54    All statutes are presumed constitutional, "and to rebut that presumption, the party challenging a statute's constitutionality has the burden of establishing a clear violation." *People v. Bochenek*, 2021 IL 125889, ¶ 10. We must construe a statute to preserve its constitutionality if reasonably possible. *Id.* The constitutionality of a statute is a question of law, which is subject to *de novo* review. *Gray*, 2017 IL 120958, ¶ 57.

¶ 55    Welch advances both a facial challenge and an as-applied challenge to the UPWF statute. A facial challenge asserts that there are no circumstances under which a statute is constitutional. *Bochenek*, 2021 IL 125889, ¶ 10. An as-applied challenge requires the defendant to demonstrate that the statute is unconstitutional as applied to the facts and circumstances of the challenging party. *Gray*, 2017 IL 120958, ¶ 58. As we have previously held, a party raising a constitutional challenge must overcome the strong presumption that a statute is constitutional. *People v. Burns*, 2024 IL App (4th) 230428, ¶ 10. The constitutionality of a statute, whether challenged facially or as applied, is reviewed *de novo*. *Gray*, 2017 IL 120958, ¶ 57.

¶ 56    Welch argues that the UPWF statute is facially unconstitutional because it bans firearm possession by those with felony convictions and a person can only circumvent the ban through a highly discretionary process. Further, because these two features apply to everyone in Illinois, and these features have no historical analogue, section 24-1.1(a) can never be constitutionally applied. 720 ILCS 5/24-1.1(a) (West 2022).

¶ 57    We disagree. Relying on the United States Supreme Court's clear statements in *Bruen* that the second amendment protects only the rights of "law-abiding citizens," we have repeatedly held that statutes prohibiting a felon from possession firearms generally fall outside the scope of the second amendment. *People v. Gray*, 2025 IL App (1st) 191086-B, ¶ 20; see *People v. Baker*, 2023 IL App (1st) 220328, ¶ 37 ("The *Bruen* Court could not have been more clear that its newly

announced test applied only to laws that attempted to regulate the gun possession of 'law-abiding citizens,' and not felons like defendant."); see also *People v. Burch*, 2025 IL App (1st) 231644-U, ¶ 23; *People v. Benson*, 2024 IL App (1st) 221230-U, ¶ 52; *People v. Martin*, 2024 IL App (1st) 221562-U, ¶ 78; *People v. Linzy*, 2024 IL App (1st) 221921-U, ¶¶ 32-33; *People v. Travis*, 2024 IL App (3d) 230113, ¶ 37; *People v. Gross*, 2024 IL App (2d) 230017-U, ¶¶ 26-27; *People v. Echols*, 2024 IL App (2d) 220281-U, ¶ 155; *People v. Mobley*, 2023 IL App (1st) 221264, ¶ 28; *People v. Muhammad*, 2023 IL App (1st) 230121-U, ¶ 24; *People v. Robinson*, 2023 IL App (1st) 220959-U, ¶ 46. We decline Welch's invitation to deviate from these decisions. Because the second amendment only protects the rights of law-abiding citizens to bear arms, the *Bruen* analytical framework does not apply to the UPWF.

¶ 58    Welch next argues this court should find the UPWF statute unconstitutional as applied to him. He claims the State cannot show any historical analogues that prohibit nondangerous convicted felons from possessing a gun outside their homes for self-defense. Welch asserts that he was not acting violently during the commission of the instant UPWF offense and his prior felony convictions were for nonviolent offenses.

¶ 59    Welch acknowledges that he did not raise his as-applied constitutional challenge to the UPWF statute below. However, he argues that because the record contains (1) the police body camera showing his conduct prior to his arrest; (2) a certified copy of his prior conviction for aggravated unlawful use of a weapon, which is the predicate felony for the instant UPWF charge; and (3) the presentence investigation report presented at sentencing, this court is capable of making an as-applied determination of constitutionality. The State argues Welch has forfeited review of his as-applied challenge by raising it for the first time on direct appeal. See *People v. Thompson*, 2015 IL 118151, ¶ 39 (a defendant may not raise an as-applied constitutional challenge for the first

time on appeal) The State further asserts that Welch's as-applied challenge turns on whether he is a nonviolent felon, a factual issue that was not litigated below.

¶ 60    Although the record does not contain any factual recitations regarding Welch's previous felony offenses, and we are, therefore, unable to ascertain the violent nature of his actions in those cases, we agree with Welch that the record in this case is sufficiently developed to allow our review of his as-applied constitutional challenge. That is because Welch's as-applied challenge centers around his status as an alleged nonviolent felon. As previously discussed, a felon is "simply outside the box drawn by *Bruen*." *Baker*, 2023 IL App (1st) 220328, ¶ 37. This court has rejected the distinction between a violent and nonviolent felon for purposes of *Bruen* and the second amendment. See *Travis*, 2024 IL App (3d) 230113, ¶ 37 (holding that the armed habitual criminal statute is constitutional, as applied to the defendant, "irrespective of the violent or nonviolent nature of [the defendant's] convictions"); *People v. Brooks*, 2023 IL App (1st) 200435, ¶ 100 (holding that the armed habitual criminal statute is constitutional, as applied to the defendant, even though his prior felonies were nonviolent ones because he was still "not a law-abiding citizen"). Hence, no further development of the record is necessary regarding Welch's circumstances or whether his prior felony conviction involved violence because the only thing that matters is that Welch is a felon, a fact already established by the certified copy of conviction entered in the trial court. And *Bruen* does not apply to felons. *People v. Lopez*, 2025 IL App (1st) 232120, ¶ 27. Therefore, we conclude the UPWF is constitutional as applied to Welch.

¶ 61                                        CONCLUSION

¶ 62    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 63    Affirmed.

¶ 64    JUSTICE HYMAN, dissenting:

- 22 -

¶ 65    This case addresses a fundamental tenet: the State must prove guilt beyond a reasonable doubt with evidence. I cannot support a ruling that accepts a trial in which the State provided no evidence to connect the object resembling a gun seen with Welch in a music video, created on an unknown date by unknown persons and uploaded to YouTube, to the gun police found during the traffic stop.

¶ 66    I thoroughly examined the record for evidence that the recovered Glock was used in the video but found none. The State cites none. The trial court cites none. Despite this, the majority affirms the conviction.

¶ 67    A trial is meant to be a contest of evidence, with the finder of fact weighing what is offered, not a proceeding for a judge to make unilateral assumptions drawn on an *ad hoc* visual comparison. When, as here, the court steps in to fill the void left by the State, taking on the role of investigator, witness, and finder of fact all at once, the trial no longer functions as an adversarial proceeding.

¶ 68    The State failed to (i) connect Welch to the object in the music video, (ii) offer chain-of-possession testimony to link the object in the video to the seized gun, or (iii) present any expert or other testimony to establish that the recovered gun and the object matched. What the State lacked was precisely the kind of evidence our legal system requires; that is, evidence tested within the adversarial process. The court made its determination solely on appearances, effectively concluding, "I see it, and therefore it must be so." Yet, no basis existed for the judge to reach that conclusion. Believing something is so does not make it so.

¶ 69    Moreover, rap music, a predominantly Black art form, often faces criticism that other genres do not. Among its themes—guns, violence, survival—are shared cultural symbols, not confessions. To interpret Welch's music video as literal truth and as evidence of criminal behavior

perpetuates harmful stereotypes and undermines constitutional principles as well as the rules of evidence.

¶ 70    The State never bridged the gap between the object resembling a gun in a music video of unknown provenance and the gun found under Welch's passenger seat. On this record, the State failed to prove constructive possession beyond a reasonable doubt.

¶ 71    Because liberty must never hinge on conjecture, I respectfully dissent.

¶ 72                    No Evidence Welch Knew a Gun Was Present

¶ 73    Viewing the evidence in the light most favorable to the State, as required, the record does not establish constructive possession. *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (appellate court assesses whether rational trier of fact could have found elements beyond a reasonable doubt). To prove constructive possession, the State must show that Welch (i) had immediate and exclusive control over the area and (ii) knew the gun was present. *People v. Wise*, 2021 IL 125392 ¶ 25; 720 ILCS 5/24-1.1(a) (West 2022) (defining possession as element of unlawful use or possession of weapons by felons). The State failed to demonstrate knowledge.

¶ 74    Mere presence in a car cannot support a finding that the person knew a gun was present. *People v. Bailey*, 333 Ill. App. 3d 888, 891-92 (2002). More evidence is required, such as (i) the gun was visible from the defendant's position, (ii) the amount of time the defendant had to observe the weapon, (iii) whether the defendant tried to retrieve or hide the gun, and (iv) the size of the gun. *Bailey*, 333 Ill. App. 3d at 891-92.

¶ 75    Regarding the first factor, visibility, the evidence favors the defense. The body-camera footage shows the officer looking under the seat and apparently finding a gun. Not only was Welch's view of the floor obstructed by a box of chicken on his lap, but the officer testified that

the gun "was not in plain view." The majority's reliance on factor one lacks support in the record. *Supra* ¶ 24.

¶ 76   Likewise, the record contains no evidence to support factors two and three. The record indicates that officers pulled over the driver for a traffic offense, so no facts supporting a finding under factor two that Welch had time to observe the weapon. Additionally, Officer Rodriguez testified that Welch did not attempt to retrieve or hide the gun, which means factor three favors Welch, too.

¶ 77   I dispute the majority's burden shifting, as it writes, "these factors do not assist us in determining whether Welch's knowledge of the gun can be inferred." *Supra* ¶ 25. Indeed, these factors are helpful, but they point to a conclusion that the majority does not wish to acknowledge.

¶ 78   Finally, regarding factor four, I disagree with the majority's description of the handheld gun as being of "substantial size." *Supra* ¶ 26. Not even the State made this assertion. The State wrote, "The relevant circumstantial evidence here, that: defendant had control over the area where the firearm was found; the firearm was identical to the one in the video; and that defendant was so nervous during the traffic stop that he was shaking and sweating; all support the court's finding of knowledge." This omission is significant; the majority's assertions lack record support.

¶ 79   Courts may consider other circumstantial evidence of knowledge. *Bailey*, 333 Ill. App. 3d at 892 (noting courts consider "any other relevant circumstantial evidence"). The State contends that (i) Welch appeared nervous after officers ordered him out of the car, (ii) Welch had control over the area around the gun, and (iii) the recovered gun was "identical" to one seen in the music video. But none of these points suffices to demonstrate knowledge.

¶ 80                    *Nervousness Not Enough*

¶ 81    First, "nervousness is not enough to uphold a finding of knowledge." *People v. Carpenter*, 2024 IL App (1st) 220970, ¶ 42 (citing *People v. Ortiz*, 196 Ill. 2d 236, 266-67 (2001)). The record also negates an adverse inference. Welch can be heard on the body camera attributing his shaking arm to a shooting injury, a statement he made to Officer Rodriguez. And Welch fully cooperated with the officers. This contrasts with cases like *People v. Williams*, 266 Ill. App. 3d 752, 760 (1994) and *People v. McKnight*, 2024 IL App (1st) 230571-U, ¶ 23, where consciousness of guilt was inferred from the defendant's attempt to flee. Thus, Welch's alleged nervousness did not substantiate finding knowledge.

¶ 82           *No Evidence of "Regular and Ongoing Control" of Automobile*

¶ 83    Second, evidence that a defendant had "regular and ongoing control" of a vehicle may warrant inferring knowledge of its contents. *People v. Hampton*, 358 Ill. App. 3d 1029, 1032 (2005). But here, the trial court could not draw that inference. The State presented no evidence that Welch had ever driven the car, let alone had regular, ongoing control of it. Nor did the State present evidence that Welch had an ownership or possessory interest in car. Indeed, on the body camera, as an aside, the driver told officers it was her car. So even if the driver was illegally transporting the gun, Welch's mere presence would not establish guilt. See *People v. Evans*, 87 Ill. 2d 77, 83 (1981) (excluding mere presence as proof of accountability).

¶ 84    But more to the point, the driver's hearsay statement to the police heard on the body camera, agreeing that she had a FOID but no weapons, of course, did not prove Welch's awareness of the gun and could not be used to infer knowledge attributable to Welch. See *People v. Duckworth*, 180 Ill. App. 3d 792, 795 (1989) (reversing as insufficient conviction where State relied on impermissible hearsay from codefendant, having failed to establish predicate

conspiracy); Ill. R. Evid. 802 (eff. Jan. 1, 2011) (barring hearsay generally). As a result, Welch's presence in the passenger seat did not establish knowledge of the car's contents.

¶ 85                                    *No Evidence Linking Guns*

¶ 86    Shockingly, not a single witness testified that an object held by Welch in the music video was even a Glock, a fact that does not appear in the majority's background or analysis.

¶ 87    The trial court acknowledged that the music video was created at an unknown time and place and uploaded to YouTube before Welch's arrest. It could have been weeks or months or years before, but, once again, the record is silent. The State never presented evidence to connect an object in the music video with the gun recovered from the car.

¶ 88    This evidentiary gap should have ended the case. But, the majority presses on, stating, "[I]t is simply not possible to conclude that no reasonable trier of fact could have found that the gun was the same, particularly where our determination on review is based solely on photographs of evidence." *Supra* ¶ 30. Essentially, the majority recognizes that it is equally unqualified to make the inference the trial court purported to draw. That said, it affirms Welch's conviction based "solely" on the music video.

¶ 89    Consider the majority's lead case, *People v. Bradley*, 2021 IL App (2d) 190009-U, ¶¶ 19, 32, where the State admitted Snapchat videos recorded the same day as the defendant's arrest, in the same clothes, and riding in the same car, holding what looked like the same gun— continuous possession. Here, the State proved none of that. The video's when and where are unknown; the officer moved the seat to reveal the gun, and the chain of custody from the video to the object is absent. *Bradley* points away from, not toward, guilt.

¶ 90    The video is 1 minute and 34 seconds and directed by "JEFFILMEDIT," a person or entity the State never identified. Welch appears in the video using the moniker "Big Woney" and, with

two young men, performs a rap song titled "Chicken Heads." Welch poses with two objects resembling guns, one of which the State argued was "the exact same * * * as the firearm recovered from under the seat."

¶ 91    Nothing in the music video provides a rational basis for inferring that Welch had possessed an actual gun. *Cf. People v. McLaurin*, 2020 IL 124563, ¶¶ 32-38 (affirming where State presented testimony of officer who saw firearm from afar and other officer who recovered firearm minutes later); *United States v. Gaines*, 295 F.3d 293, 300-01 (2d Cir. 2002) (affirming where government presented both videos of defendant looking at firearms and the firearms themselves). As Officer Rodriguez testified, no evidence shows when or where the music video was created. Nor was there any testimony about who made the recording or whether the police determined the object to be a real Glock, an air pistol, or a facsimile.

¶ 92    Significantly, the music video's quality is marred by typical digital recording issues such as compression, motion blur, poor lighting, camera angles, and distortion from the lens. Shadows and reflections further worsen clarity. See, *e.g.*, Patrick Grother, George Quinn, & Mei Ngan, *Face In Video Evaluation (FIVE) Face Recognition of Non-Cooperative Subjects*, Nat'l Inst. of Standards & Tech. Interagency Rep. 8173 (March 2, 2017), https://nvlpubs.nist.gov/nistpubs/ir/2017/NIST.IR.8173.pdf    [https://perma.cc/B5EA-FSNV] (video quality, particularly factors such as lighting, size, and compression, directly impacts reliability). These flaws make it nearly impossible to determine fine details for comparison, including color, the depth of the object's frame's texture, and the presence of scratches, abrasions, or other distinctive marks. (The quality and clarity of the video may be observed on YouTube. See Big Woney, *Big Woney—Chickenheads (Official Video)*, YouTube (Feb. 5, 2022), https://www.youtube.com/watch?v=0c-2ODxgZlM [https://perma.cc/BE25-9F9B]).

¶ 93    While the gun held by the judge may be rotated, calibrated, and its component parts and surfaces examined closely, none of that is possible with the video itself or images taken from it. Furthermore, features listed by the judge—backstrap color, slide lock, serrations, trigger-guard curve, grip texture, and extended magazine—all describe standard mass-produced features of Glocks, which offers easily swapped parts. Without high-quality stills, controlled angles, and precise measurements, "distinctive" reduces to "looks alike to me."

¶ 94    Nor do the freeze frames rescue the State's proof. The majority reaches its conclusion by creating its own freeze-frame image, which was not an exhibit at trial, and uses it as if it supplies evidence. *Supra* ¶ 27. Three freeze-framed photos are in evidence (People's exhibit 3). As the majority's own freeze-frame image and People's exhibit 3 demonstrate, the freeze-frames are blurry, grainy, indistinct, and pixelated. As such, human perception has its limits, even for the most attentive observer. Kathy Pezdek & Tamar Lerer, *Let's Go to the Tape: Science-Based Standards for Non-Eyewitness Identifications in a Surveillance World*, 59 Crim. L. Bull., no. 1, Winter 2023 (observing how, "[t]o a large extent, the quality of an image is determined by the resolution of the image and the distance of the subject from the video camera").

¶ 95    People's exhibit 3 suffers from the same deficiencies as the music video from which they were drawn and then some. Forensic practice recognizes that only high-quality photographs, rather than degraded or distorted video images, provide the necessary detail for valid comparisons and admissibility as evidence. See, *e.g.*, *People v. Simmons*, 2016 IL App (1st) 131300, ¶¶ 106-131 (indicating technical basis required for expert opinion on firearm comparison).

¶ 96    The problem deepens once one considers mass production and facsimiles. Welch's posttrial motion explained that Glock air pistols, indistinguishable from Glock pistols, are widely available. Consequently, the music video offers no rational basis for distinguishing between the two,

especially considering that Glock pistols are manufactured in mass quantities to a level of precision that hundreds of thousands, and even millions, of them will look the same externally. When viewed in the music video or freeze-framed stills in evidence, one Glock model is indistinguishable from another Glock of the same or similar model. And while resemblance can leave an impression, that impression does not equate with evidence. Brandon L. Garrett *et al.*, *Judging Firearms Evidence and the Rule 702 Amendments*, 107 Judicature 40 (2023) (noting necessity of peer-reviewed methods, careful record-keeping, and the observance of Rule 702 standards of reliability in the assessment of firearms comparison evidence).

¶ 97    Glock pistols are among the most popular firearms in the United States. Fresh Air, *How the Glock Became America's Weapon of Choice*, Nat. Pub. Radio (Jan. 24, 2012) https://www.npr.org/2012/01/24/145640473/how-the-glock-became-americas-weapon-of-choice [https://perma.cc/AQ8N-LYQJ]. The recovered gun was a black Glock 17 with a light brown backstrap. The mass production of Glocks results in a high level of uniformity, including interchangeable parts. See generally Tom Diaz, *The American Gun Industry: Designing & Marketing Increasingly Lethal Weapons*, *in* Suing the Gun Industry 84 (Timothy D. Lytton, ed., 2006) (arguing "the American gun industry is quite literally the father of the system of mass production of consumer goods that lies at the heart of American industry, indeed, of much of the world's industry").

¶ 98    Similarity in type and appearance is insufficient for establishing a connection. This argument can also apply to countless consumer goods, like iPhones, Nike Air Force 1 shoes, or Toyota Camrys of the same trim. The record is devoid of evidence involving similar distinctive characteristics. This is a stunning omission in a market where millions of Glock 17s and airsoft or facsimile versions of 17s and similar-looking models are in circulation. See Logan Metesh, *A*

*(Mostly) Complete History of the Glock 17*, Guns & Ammo Handguns, Dec. 26, 2024, https://www.handgunsmag.com/editorial/glock-17-pistol-complete-history/513089 [https://perma.cc/5BDL-Z4V7] (noting, as of December 2023, "more than 23 million Glock pistols of all five generations were in circulation worldwide"); Umarex Airguns, https://www.umarexusa.com/glock-pistols (last visited Sept. 16, 2025) [https://perma.cc/2JKX-JFSU] (selling "[o]fficially licensed" Glock replicas and airsoft guns).

¶ 99    Despite all these flaws, the trial court rested its decision on appearance alone. The judge "eyeballed" a video of unknown date and place and declared a match to the gun presented in court. That is pure conjecture, not permissible inference. See *People v. Davis*, 278 Ill. App. 3d 532, 540 (1996) (inference without evidentiary link is speculation). Absent from the record is any evidence of identification presented by lay observers or experts. Absent from the record is any reliable image quality or qualified comparison testimony.

¶ 100   The trial court even realized that "there'd be no way of knowing if [the apparent gun] was a prop *** or if it was something else." Still, astonishingly, the trial court made that choice.

¶ 101   In denying Welch's posttrial motion, the trial court compared the recovered gun to an image from the music video, stating, "It has exactly the same colorations, the same markings. Everything is the same." The trial court's language reveals a decision unmoored from evidence and relies instead on appearance, turning the music video into what it was not—evidence of a genuine match.

¶ 102   The trial court also described the recovered gun as "very distinguishable." The trial judge did not elaborate, nor could the judge without testimony related to the object's specific model and serial number, wear patterns, marks or scratches, or other unique, atypical, or individualized features.

¶ 103   Similarity alone constitutes an unsupported conclusion, unjustifiable when deprived of evidence of similarity like photographic comparison testimony, firearm expert testimony, or forensic analysis. See generally *State v. Adams*, 572 P.3d 291, 310-11 (Or. Ct. App. 2025) (discussing "subjectivity" and "validity" when assessing admission of scientific evidence).

¶ 104   The State cannot be relieved of its burden of proof.

¶ 105                               *Creative Expression*

¶ 106   Welch is a hip-hop artist whose song appeared in a music video the State played for the trial court. The song's lyrics reference drug use, shootings, and sexual acts.

¶ 107   Art is not autobiography, especially when it serves as a medium for marginalized voices to confront injustice. Courts have cautioned against treating creative persona as evidence of criminal conduct, as this "blur[s] the line between the artistic expression of a musical performer and that performer's state of mind [as a] criminal defendant." See *United States v. Alvarez-Núñez*, 828 F.3d 52, 53 (1st Cir. 2016) (reversing as "substantively unreasonable" sentencing order). Even if the music video glorified guns in an abstract sense, the State must prove Welch's guilt regarding the charged offense. 720 ILCS 5/24-1.1(a) (West 2022) (defining unlawful use or possession of weapon by felon); *Collins*, 106 Ill. 2d at 261 (stating standard of review). Whatever minimal probative value the music video might have on "knowledge" was overshadowed by the risk that Welch would be typecast based on his persona.

¶ 108   Cultural assumption does not meet the standards the law requires. *Davis*, 278 Ill. App. 3d at 540 ("If an alleged inference does not have a chain of factual evidentiary antecedents, then within the purview of the law it is not a reasonable inference but is instead mere speculation."). To state the obvious, "[m]usicians often embellish the details of a story when singing about a personal experience. Hip hop artists in particular frequently use their music to boast about crimes that either

they had no part in or are even entirely fictional." *People v. Cross*, 2021 IL App (4th) 190114, ¶ 139.

¶ 109   Courts routinely reject arrest records—hearsay claims about criminal activity—as evidence of violent character. *People v. Cook*, 352 Ill. App. 3d 108, 129 (2004). Given their nature, music videos are even less reliable. See, *e.g.*, *State v. Skinner*, 95 A.3d 236, 251 (N.J. 2014) ("One would not presume that Bob Marley, who wrote the well-known song 'I Shot the Sheriff,' actually shot a sheriff ***."). Relying on an apparently random video downloaded from the Internet, especially with the advent of  artificial-intelligence-generated fakes, undermines due process. See, *e.g.*, Nina I. Brown, *Deepfakes and the Weaponization of Disinformation*, 23 Va. J.L. & Tech. 1, 16 (2020) ("As the Internet has revolutionized the way we receive and share information, it 'has also facilitated the spread of *mis*information because it obviates the use of conventional "gate-keeping" mechanisms, such as professional editors.' " (Emphasis in original.)).

¶ 110                    Trial Court's Hostility Toward Welch's Counsel

¶ 111   Finally, I cannot ignore the trial court's statements during Welch's counsel's cross-examination of the State's only witness on a core, missing aspect of the State's proof. Counsel for Welch was trying to establish (i) Officer Rodriguez's lack of knowledge regarding how and when the music video was filmed and thus (ii) whether the objects held by Welch in the recording were real firearms.

¶ 112   Here is an excerpt of the exchange between the trial court and Welch's counsel:

> "THE COURT: [Counsel], you're not going to go advance your cause—your client's cause by asking questions that are so ridiculous as—to this officer that, oh, you were not present when it was recorded. That is argumentative. If you want to make that point later on in your argument, that's fine.

I think—I got a hunch. I just have a little bit of a hunch that [the State] would have brought out the fact that he was there and saw the defendant waving a gun around at the time the video was made. That might have come up. It might have come up in direct examination. So asking ridiculously silly questions in front of me just drives me crazy because it doesn't advance what we're trying to do during the course of litigation. Don't fall victim to that.

This is not a bunch of kids playing let's play lawyer, let's play courtroom, let's play trial, let's play cops and robbers, let's do that. This is the real world here. So take a breath, compose yourself, and ask appropriate questions. Proceed. And that last question about whether he was there that's not an appropriate question. So ask a different one.

COUNSEL: Judge, I have nothing further for this witness."

¶ 113   The entire exchange captures hostility. *People v. Smith*, 205 Ill. App. 3d 153, 157 (1990) (trial court has "duty to be attentive, patient[,] and impartial"). Additionally, as noted in *People v. Greer*, 293 Ill. App. 3d 861, 864 (1997), curtailing defense counsel's impeachment during cross-examination, as here, can constitute reversible error. Judges, as the dominant authority in the courtroom, must remain composed and demonstrate the professional behavior they expect from others. *People v. Velazquez*, 2025 IL App (1st) 230449, ¶ 83 (reminding trial court how courtroom etiquette reflects shared set of norms benefitting all in open pursuit of truth).

¶ 114                              Second Amendment

¶ 115   Because the evidence is insufficient, I would not reach the second amendment challenge. Appellate courts refrain from deciding constitutional questions that need not be resolved. *In re E.H.*, 224 Ill. 2d 172, 179 (2006).

## *People v. Welch*, 2025 IL App (1st) 231116

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 22-CR-03554(01); the Hon. James M. Obbish, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Rebecca I. Levy, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Brian K. Hodes, and Susan Wobbekind, Assistant State's Attorneys, of counsel), for the People. |