2026 IL App (2d) 250069-U
No. 2-25-0069
Order filed February 3, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 22-CF-479 |
| JULIAN R. GOVEA, | ) ) | Honorable Julia A. Yetter, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The State proved defendant guilty of unlawful possession of a weapon by a felon beyond a reasonable doubt and the unlawful possession of a weapon by a felon statute is not facially unconstitutional under the second amendment.

¶ 2    Following a jury trial, defendant, Julian Govea, was found guilty of unlawful possession of a weapon by a felon (UPWF) (720 ILCS 5/24-1.1(a) (West 2022)). Defendant appeals, contending that (1) the evidence was insufficient to prove him guilty beyond a reasonable doubt and, alternatively, (2) the UPWF statute is facially unconstitutional under the second amendment of the United State Constitution (U.S. Const., amend. II). We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      In the early morning hours of March 19, 2022, a Chevy Tahoe driven by Blanca Rico was stopped for a traffic violation. Rico had two passengers—Andres Ramirez, who was seated in the front passenger seat, and defendant, who was seated in the right rear passenger seat. During the stop, after learning that defendant was wanted on an outstanding warrant, a police officer opened defendant's door and asked him to exit the vehicle. As defendant turned his body and his feet emerged from the vehicle, a gun fell from the vehicle's rear floorboard onto the ground. Defendant was arrested, and the matter proceeded to a jury trial on one count of aggravated unlawful use of a weapon (AUUW) (720 ILC 5/24-1.6(a)(1), (a)(3)(A-5) (West 2022)) and one count of UPWF (*id.* § 24-1.1(a)).

¶ 5      The following evidence was presented at trial. Aurora police officer Lauren Miller testified that, at approximately 1:20 a.m. on March 19, 2022, she was on patrol in Aurora. Miller conducted a traffic stop on Rico's vehicle after observing Rico disobey a stop sign. She approached the driver's side of the vehicle and spoke with Rico. Miller observed Ramirez in the front seat, and defendant in the right rear passenger seat. Miller ran Ramirez's and defendant's names through "LEADS" (Law Enforcement Agencies Data System) and learned that both men were wanted on outstanding warrants. In the meantime, additional officers arrived on the scene to assist Miller with the traffic stop, including Aurora police officers Joel Clausing and Derek Stoch. (Miller testified that Clausing was unavailable to testify because he was on medical leave.)

¶ 6      Miller testified that, after learning of the passengers' outstanding warrants, she returned to the vehicle and approached the front passenger side door. She advised Ramirez of the outstanding warrant and asked him to exit the vehicle. Miller searched Ramirez and discovered only cannabis. Ramirez was taken into custody and walked to the front of the squad car, which was parked behind

Rico's vehicle. While Miller was occupied with Ramirez, Rico and defendant remained in Rico's vehicle with an officer standing by the vehicle.

¶ 7    Miller testified that, after she took Ramirez into custody, she returned to the vehicle to take defendant into custody. Miller opened the right rear passenger door while watching defendant's hands. When she opened the door, "[t]here was a firearm that fell out from by the defendant's feet." Miller "heard a loud noise coming from the area, looked down, and saw it on the ground, and then kind of like moved it out of the way with [her] foot." Miller secured the gun after removing defendant from the vehicle. She testified: "I had gloves on, took the magazine out, and locked the slide back so that it was not loaded and operable." She explained that the gun was "loaded and operable" when she first recovered it. Miller testified that she also searched Rico and the vehicle; nothing else was recovered.

¶ 8    Miller identified (1) the gun, which she described as a "Hi-Point" (People's exhibit No.1); (2) ten "9-millimeter cartridges," which had been found in the magazine (People's exhibit No. 2); and (3) "the magazine that was inside the handgun" (People's exhibit No. 3). Each exhibit was admitted into evidence.

¶ 9    During Miller's testimony, three edited video recordings taken from police officer body cameras were also admitted into evidence (as People's exhibit No. 4) and played for the jury. Miller testified that only one of the video clips was from her body camera; the two other clips were from other officers' body cameras. The first video clip—from Miller's body camera—is seven seconds long. It depicts the right rear passenger door being opened and defendant turning his body to exit the vehicle. (The gun is not visible, but it can be heard hitting the ground.) The second video clip is six seconds long. It depicts the rear of Rico's vehicle with Miller standing at the right rear passenger door, along with another officer standing to her right. Ramirez is visible standing

to the left in front of a squad car. An officer is visible walking toward Miller as Miller opens defendant's door. As defendant extends his feet out of the vehicle, the gun is clearly visible falling to the ground. The third video clip is one minute long. It depicts, in slow motion, the gun falling from the vehicle.

¶ 10    On cross-examination, Miller testified that, when the backup officers arrived, she had an officer stand on the passenger side of Rico's vehicle while she ran the occupants' information through LEADS. She testified that "probably a few minutes" passed from the time that she left the driver's window until the officer arrived to stand at the passenger side of the vehicle. No officer reported observing any movement within the vehicle. Neither Ramirez nor defendant were wearing gloves. Miller had asked Clausing to "run the gun" and it came back "clear." The gun had a serial number, and it was not defaced. Miller made no effort to locate the owner of the gun. Miller did not see defendant put the gun on the floor of the vehicle.

¶ 11    Rico testified that, early in the morning on the date in question, she picked up Ramirez, who was a long-time family friend, from his house in Aurora. Rico took Ramirez to defendant's house, which was also in Aurora. Rico did not know defendant; she had only "seen him" with "other people that [she] [hung] out with." When Rico and Ramirez arrived at defendant's house, Ramirez exited the vehicle, walked to the rear of the house, and returned with defendant, who was carrying a bottle of liquor. The two men entered the vehicle—Ramirez sat in the front passenger seat and defendant sat in the right rear passenger seat. According to Rico, defendant had never been in her vehicle before. Rico was in the vehicle for "[m]aybe ten minutes" before being pulled over by the police. Miller approached her vehicle, and Rico provided Miller with her driver's license and proof of insurance.

¶ 12    Rico testified that she remained in the vehicle with defendant while Ramirez was being arrested. During this time, there was another officer standing on the right side of the vehicle. Rico and defendant did not speak. When Miller returned to the vehicle, Rico heard her tell defendant that he had an outstanding warrant and ask him to exit the vehicle. When Miller opened defendant's door, Rico heard the gun fall out of the car and hit the ground. Rico had never seen the gun before. She had never seen Ramirez with a gun. She knew that the gun was not in her car when she picked up defendant because she had cleaned and vacuumed the backseat area the day before. Rico had a "FOID [(Firearm Owners Identification)] card," but she did not own a gun.

¶ 13    On cross-examination, Rico testified that Ramirez was "[l]ike a cousin" to her and that she had known him for "10-ish" years. Rico testified that she noticed the squad car behind her "like not too long after [she] left." She passed the squad car as she was heading south on Farnsworth Avenue and then the squad car got behind her. After Miller pulled Rico over and gathered everyone's information, there was "a gap in time" between Miller's return to her squad car to process their information and the arrival of another police officer at Rico's vehicle. During this time, Rico heard defendant "[m]oving." She explained the movement as "maybe like him getting comfortable in his seat."

¶ 14    Stoch testified that he responded to the scene to assist Miller. After Miller removed Ramirez from the vehicle, Stoch "stood by the back-passenger area" and kept his eyes on Rico and defendant. The front passenger door remained open; the right rear passenger door was closed. During this time, Stoch did not see Rico pass anything to defendant. Miller returned and opened defendant's door to remove defendant. As Miller opened the door and defendant proceeded to exit the vehicle, a firearm "[s]imultaneously" fell out of the vehicle to the ground. Stoch described the firearm as being "kicked out of the vehicle." Stoch both heard and saw the firearm fall to the

ground. As defendant was arrested, Stoch stood by watching Rico and the firearm. Miller returned and picked up the firearm. Stoch did not see anyone else touch the firearm before Miller picked it up.

¶ 15    Stoch further testified that, after Rico was removed from the vehicle, Stoch searched the backseat area. Stoch observed a bottle of Crown Royal and a Twisted Tea; he did not find any other weapons or ammunition. Stoch identified People's exhibit Nos. 7 and 8 as photographs of the backseat area. Stoch identified People's exhibit No. 6 as a video clip taken from his body camera. The video clip, which is seven seconds long, was played for the jury. The video shows Miller opening the right rear passenger door and defendant turning his body to exit the vehicle. As defendant's legs exit the vehicle, the gun can be heard hitting the ground. The gun is not visible in the video.

¶ 16    On cross-examination, Stoch agreed that there was a period after he arrived on the scene during which no officer was standing near Rico's vehicle. Stoch was shown two still images taken from his body camera. Defendant's exhibit No. 1 shows the back seat of the vehicle with a bottle of Crown Royal on the seat. Defendant's exhibit No. 2 shows the back seat of the vehicle with both rear doors open.

¶ 17    Aurora police officer David Adams testified that he was working as an evidence technician at the time of the offense. On March 21, 2022, he processed the gun, magazine, and 10 unfired bullets that were recovered from the vehicle. He first swabbed the gun for DNA. He then attempted to obtain fingerprints from the gun but was unable to do so. He also attempted, but was unable, to obtain fingerprints from the magazine and bullets.

¶ 18    On cross-examination, Adams agreed that he did not swab the gun's trigger, magazine release, or safety for DNA.  He also agreed that he did not swab the bullets for DNA.  Finally, he agreed that DNA can be deposited on an item without the item having been touched.

¶ 19    On redirect examination, Adams stated that "processing evidence *** [was] a balancing act."  He explained: "[Y]ou have to decide if you want to swab for DNA or if you want to process for prints.  Swabbing for DNA can damage fingerprints."  And "[p]rocessing for prints can contaminate any DNA."

¶ 20    Katherine Sullivan, a forensic scientist with the Illinois State Police, testified as an expert in DNA analysis.  Sullivan received and tested two swabs containing DNA—one swab was obtained from defendant and the other swab was obtained from the firearm.  Sullivan obtained a "single male DNA profile" from defendant's swab.  Sullivan determined that the swab from the firearm contained a mixture of DNA from four individuals.  Sullivan explained that she used a software tool called STRmix to interpret mixtures of DNA profiles.  She testified:

> "STRmix works by taking the sample data that I've obtained from that particular item.  I will evaluate that data in advance to determine how many people have contributed to that DNA mixture.  I put that into the software as well.  And then STRmix is going to use everything that we know about how DNA behaves in that kind of environment.
>
> And it's going to propose combinations of DNA types for each one of the contributors to that mixture.  Combinations that explain the data well are going to be rated very highly and combinations that explain the data poorly are going to be ranked much lower."

¶ 21    Counsel asked whether STRmix allowed an individual's DNA profile to be compared to a DNA mixture.  Sullivan responded:

"It does. So if I wanted to compare someone's DNA type to that particular mixture sample, all I would have to do is take that person's DNA profile, input that into the STRmix software. The software will then compare that person's DNA types to all the combinations it already proposed for that mixture. And then using some published data it's going to calculate a likelihood of seeing those DNA results given to competing scenarios. Now the scenarios are usually that the person you're comparing is a contributor to that DNA result versus the DNA originated from someone other than that person that you're using for comparison."

¶ 22 Sullivan testified that, using STRmix, she compared defendant's DNA to the "evidence standard," *i.e.* the DNA swab from the firearm. The following colloquy occurred:

"Q[.] Now what competing scenarios did you use to make the comparison from the samples from [defendant] to the DNA results from *** [the] swabs from the firearm?

A[.] So for that comparison I used the first scenario as the DNA results came from [defendant] and three unknown individuals versus the DNA results came from four unknown individuals.

Q[.] What were the results of that comparison?

A[.] That the DNA results are 60 times, 60, 6-0, times more likely if the DNA originated from [defendant] and three unknown individuals than if the DNA originated from four unknown individuals.

Q[.] So how would you describe those results?

A[.] I would say that that analysis provides limited support for the proposition that [defendant] is a contributor to that DNA mixture."

¶ 23    On cross examination, Sullivan testified as to how DNA could be transferred.  She stated that a "[p]rimary transfer" occurred when an individual actually touched an item and left their cells on the item.  A "[s]econdary transfer" occurred when an individual touched an item in the same area that had been previously touched by someone else and picked up the cells of the original individual.  Sullivan agreed that if counsel shook Sullivan's hand and then counsel picked up a pen, Sullivan's DNA could be transferred to the pen despite Sullivan never having touched it.  She also agreed that her report could make no conclusion as to how DNA came to be on an item.  Sullivan explained that "limited support" meant "[s]ome support for one of the propositions but not—It's not moderate.  It's not strong.  It's not very strong.  It's limited support."  Sullivan was not provided with additional standards to determine who else may have contributed to the mixed DNA profile obtained from the gun.

¶ 24    The parties entered several stipulations into evidence.  Among other things, the parties stipulated that (1) on March 19, 2022, defendant was a convicted felon and (2) a review of Illinois State Police records revealed that, on or before March 19, 2022, defendant had not been issued a FOID card or a concealed carry license.

¶ 25    Following the State's evidence, defendant rested without presenting evidence.

¶ 26    During jury deliberations, after about four hours, the jury sent out a question, which was read to the parties by the trial court:

"We are hung on the second charge, unlawful possession of a firearm by a felon. What do we do?  We have a conclusion on the other charge."

Per the parties' agreement, the trial court advised the jury "to keep deliberating."  The jury was sent home that evening and returned the next morning.  Later the next morning, the jury sent out another question, which was read to the parties by the trial court:  "Can we physically feel the

weight of the gun, hold the gun for size, weight, shape?" The trial court sent the gun and magazine to the jury room.

¶ 27    The jury found defendant not guilty of AUUW (720 ILC 5/24-1.6(a)(1), (a)(3)(A-5) (West 2022)) and guilty of UPWF (*id.* § 24-1.1(a)). Defendant filed a motion for a new trial or, in the alternative, for judgment notwithstanding the verdict. The trial court denied the motion. Following a sentencing hearing, the court sentenced defendant to four years in prison, to be served at 50 percent.

¶ 28    This timely appeal followed.

¶ 29                                    II. ANALYSIS

¶ 30                            A. Sufficiency of the Evidence

¶ 31    Defendant first contends that the State failed to prove him guilty beyond a reasonable doubt of UPWF (*id.*). According to defendant, the State failed to prove the elements necessary to establish that he constructively possessed the firearm that fell from Rico's vehicle, *i.e.*, that defendant (1) had knowledge of the presence of the firearm and (2) exercised immediate and exclusive control over the area in which it was found. We disagree.

¶ 32    In reviewing a challenge to the sufficiency of the evidence, the relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "A guilty verdict may be supported by not only the evidence itself, but also any reasonable inference that may be drawn from the evidence." *People v. Hsiu Yan Chai*, 2014 IL App (2d) 121234, ¶ 33. It is not this court's role to retry the defendant. *People v. Gray*, 2017 IL 120958, ¶ 35. Rather, it is the responsibility of the trier of fact, the jury here, to resolve conflicts in the testimony, weigh the evidence, and

draw reasonable inferences from the facts. *Id.* Therefore, we will not substitute our judgment for that of the jury on issues involving the weight of the evidence or the credibility of the witnesses. *Id.* A defendant's conviction will not be overturned unless the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. *Id.*

¶ 33 To sustain a conviction of UPWF, the State must prove that defendant (1) knowingly possessed a firearm and (2) had previously been convicted of a qualifying felony defense. 720 ILCS 5/24-1.1(a) (West 2022). Defendant does not contest the sufficiency of the evidence as to the second element. Accordingly, we confine our analysis to whether defendant knowingly possessed a firearm.

¶ 34 "Possession may be actual or constructive." *People v. Jones*, 2023 IL 127810, ¶ 30. Although the State maintains that the evidence was sufficient to prove actual possession, the State also acknowledges that, because the firearm was not found on defendant's person, the State must prove constructive possession. See *id.*; *People v. Wade*, 2025 IL App (1st) 231683, ¶ 25, *pet. for leave to appeal pending*, No. 132355 (filed Oct. 8, 2025); see also *People v. Wise*, 2021 IL 125392, ¶ 24 (equating possession " 'on' " the defendant's person with actual possession, and possession " 'about' " his person with constructive possession). "To establish constructive possession, the State must prove that the defendant [(1)] knew contraband was present and *** [(2)] exercised immediate and exclusive control over the area where the contraband was found." *Jones*, 2023 IL 127810, ¶ 30. Because we find that the evidence was sufficient to establish constructive possession, we do not consider whether the evidence was otherwise sufficient to prove actual possession.

¶ 35 We first consider whether the State proved beyond a reasonable doubt that defendant knew the gun was present in the vehicle. Defendant contends that the evidence was insufficient to prove

that he knew the gun was present because (1) there was no evidence that he had a possessory interest in Rico's vehicle, (2) he was a back seat passenger who had been picked up minutes earlier by someone he did not know well, (3) Rico did not see anyone enter the vehicle with a gun, (5) the gun was not readily visible to the officers, (6) there were no photographs entered into evidence showing the gun's position in the vehicle, and (7) the DNA evidence only showed a possibility of contact. According to defendant, his mere presence in the vehicle where the gun was found was insufficient to establish knowledge.

¶ 36 "Knowledge of existence of a firearm with the defendant's possession may be proved through circumstantial evidence." *People v. Bailey*, 333 Ill. App. 3d 888, 891 (2002); see *Jones*, 2023 IL 127810, ¶ 30 ("Because knowledge is the mental element of an offense, it is often proved by circumstantial evidence rather than direct proof."). To be sure, a defendant's "mere presence" in a vehicle in which a weapon is found, without more, is insufficient to establish knowledge. *Bailey*, 333 Ill. App. 3d at 891. However, knowledge can be inferred from several factors, including "(1) the visibility of the weapon from [the] defendant's position in the car, (2) the period of time in which the defendant had an opportunity to observe the weapon, (3) any gestures by the defendant indicating an effort to retrieve or hide the weapon, and (4) the size of the weapon." *Id.* at 892. We note that the *Bailey* factors do not constitute the exclusive means for determining whether a vehicle occupant knew that a firearm was present; rather, courts should also consider any other relevant circumstantial evidence. *People v. Welch*, 2025 IL App (1st) 231116, ¶ 23, *pet. for leave to appeal pending*, No. 132441 (filed Nov. 17, 2025).

¶ 37 Here, applying the *Bailey* factors and viewing other circumstantial evidence in the light most favorable to the State, a rational trier of fact could have found that defendant knew that the firearm was present. Defendant was sitting in the back seat of a vehicle that had been recently

cleaned and vacuumed. There was nothing else present on the backseat floor of the vehicle but the gun. Whether defendant was in the back seat for "[m]aybe ten minutes" before the vehicle was pulled over or whether they were pulled over "not too long after" defendant entered the vehicle, the jury could have reasonable concluded that defendant was present in the vehicle for enough time to have had the opportunity to observe the gun at his feet. There can be no dispute that, while sitting in the back seat, defendant was in close proximity to the gun. See *Wade*, 2025 IL App (1st) 231683, ¶ 28, *pet. for leave to appeal pending*, No. 132355 (filed Oct. 8, 2025) (finding that "[the] defendant's proximity to the firearm [on a nearby floorboard] [was] a relevant factor that weighed in favor of a finding of knowledge"). Indeed, given the video evidence, the jury could have reasonably inferred that defendant's feet were in direct contact with the gun. The videos showed that the gun did not immediately fall out of the vehicle when Miller opened the door, which might have suggested that the gun, if small enough, may have been hidden between the seat and the door and possibly unknown to defendant. Rather, it was not until defendant turned his body and placed his feet outside the vehicle that the gun fell out. We note, too, that the jury was able to see the gun and magazine. In fact, they specifically requested to do so to determine the "size, weight, shape."

¶ 38 Defendant makes much of the fact that the gun was not "readily visible to any of the officers" and that "it must have been small enough to fit between the seat and seatbelt panel." The officers' failure to see the gun before it fell from the car is of no consequence. Defendant's door was closed until Miller opened it and asked him to exit. We fail to see how any of the officers standing outside of the passenger side of the vehicle would have been able to see a gun at or under defendant's feet through a closed rear passenger door. Contrary to defendant's assertion, there is no evidence that the gun was "small enough to fit between the seat and seatbelt panel" or that it was hidden. Indeed, the gun was of such size that defendant was unable to exit the vehicle without

2026 IL App (2d) 250069-U

disturbing it. Had it been hidden, for instance under the front passenger seat, this would not have been the case. The fact that defendant was unable to exit without disturbing the gun suggests that it was at his feet and observable during his time in the vehicle.

¶ 39    In addition, although there is some dispute as to whether defendant made any furtive movements in an attempt to conceal the gun, the jury could have relied on Rico's testimony about defendant "[m]oving" in his seat and reasonably inferred that defendant was moving in an attempt to conceal the gun by pushing it under the front seat with his feet.

¶ 40    Concerning the DNA evidence, it was for the jury to determine the appropriate weight to be given to the evidence. While certainly not overwhelming, the evidence provided "some support" for a conclusion that defendant was a contributor to the DNA found on the gun. In any event, given our discussion above, the DNA evidence was not essential to the jury's conclusion. Even absent the DNA evidence, the jury could have rationally determined that defendant knew the gun was present.

¶ 41    We next consider whether the evidence was sufficient to establish that defendant "exercised immediate and exclusive control over the area where the contraband was found." *Jones*, 2023 IL 127810, ¶ 30. It was. "The State proves control by showing that a defendant had the intent and capability to exercise dominion over the area where the gun was found." *Welch*, 2025 IL App (1st) 231116, ¶ 21, *pet. for leave to appeal pending*, No. 132441 (filed Nov. 17, 2025). "Among other things, courts may consider a defendant's ability to access the item." *Id.* "It is well settled *** that '[t]he rule that possession must be exclusive does not mean*** that the possession may not be joint.' " *Wade*, 2025 IL App (1st) 231683, ¶ 35, *pet. for leave to appeal pending*, No. 132355 (filed Oct. 8, 2025) (quoting *People v. Givens*, 237 Ill. 2d 311, 335 (2010)). Here, defendant was the only person in the back seat of the vehicle and the gun was located by his feet.

Thus, the jury could have reasonably inferred that defendant had immediate and exclusive control over the gun. Even if it could be argued that Rico or Ramirez shared possession of the gun, this would not defeat a finding that defendant had constructive possession of the gun.

¶ 42 The cases relied on by defendant are distinguishable and do not require reversal of his conviction. See *Wise*, 2021 IL 125392, ¶ 1 (no constructive possession where firearm was found near passengers in the third row of a minivan that the defendant was driving); *People v. Hampton*, 358 Ill. App. 3d 1029, 1033 (2005) (no constructive possession where the weapon was hidden in a sock in the glove compartment); *Bailey*, 333 Ill. App. 3d at 892 (no constructive possession where the gun was found during an inventory search of a vehicle hidden under the passenger seat where the defendant had been sitting and there was no other evidence that allowed for an inference of knowledge).

¶ 43 Based on the foregoing, we find that circumstances here were sufficient to support a conclusion that defendant knew of the presence of the firearm and that he had exercised immediate and exclusive control over the area where the firearm was located. Accordingly, we hold that defendant was proved guilty of UPWF beyond a reasonable doubt.

¶ 44                   B. Constitutionality of the UPWF Statute

¶ 45 Defendant next contends that his conviction must be reversed because the UPWF statute is facially unconstitutional under the second amendment of the United State Constitution (U.S. Const., amend. II) and the analysis established by the Supreme Court in *New York Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). We disagree.

¶ 46 In considering the constitutionality of the UPWF statute, we keep in mind the following well-established principles. "A statute is presumed constitutional, and the party challenging the statute bears the burden of demonstrating its invalidity." *People v. Graves*, 207 Ill. 2d 478, 504

(2003). A defendant may challenge the facial constitutionality of a statute at any time. *People v. Thompson*, 2015 IL 118151, ¶ 32. "A party raising a facial challenge to a statute faces a particularly heavy burden." *People v. Bochenek*, 2021 IL 125889, ¶ 10. "A statute will be deemed facially unconstitutional only if there is no set of circumstances under which the statute would be valid." *Id.* "We have a duty to construe the statute in a manner that upholds the statute's validity and constitutionality, if it can reasonably be done." *People v. Hollins*, 2012 IL 112754, ¶ 13. The constitutionality of a statute is a question of law, which we review *de novo*. *People v. Garvin*, 219 Ill. 2d 104, 116 (2006).

¶ 47    The UPWF statute provides in pertinent part:

"(a) It is unlawful for a person to knowingly possess on or about his person or on his land or in his own abode or fixed place of business any weapon prohibited under Section 24-1 of this Act or any firearm or any firearm ammunition if the person has been convicted of a felony under the laws of this State or any other jurisdiction." 720 ILCS 5/24-1.1(a) (West 2022).

The second amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II.

¶ 48    Defendant contends that, under the analysis set forth by the Supreme Court in *Bruen*, the UPWF statute violates the second amendment. In *Bruen*, the Court announced a two-step test for determining whether a firearm regulation is constitutional. First, the court must decide whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 17. If it does not, then the statute at issue does not violate the second amendment. See *id.* at 18. However, if the plain text does cover the regulated conduct, then "the Constitution presumptively

protects that conduct," and to justify the regulation, the government must establish that the statute "is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17-18.

¶ 49 Defendant argues that the plain text of the second amendment covers his conduct—firearm possession—and, thus, such conduct is presumptively protected by the second amendment. However, *Bruen* states that "the Second and Fourteenth Amendments protect the right of an ordinary, *law-abiding* citizen to possess a handgun in the home for self-defense" and "a similar right to carry handguns publicly for their self-defense." (Emphasis added.) *Bruen*, 597 U.S. at 8-10. In *People v. Baker*, 2023 IL App (1st) 220328, ¶ 2, *pet. for leave to appeal pending*, No. 130174 (filed Nov. 3, 2023), the First District rejected the defendant's facial challenge to the constitutionality of the UPWF statute. The court explained that "[t]he *Bruen* Court could not have been more clear that its newly announced test applied only to laws that attempted to regulate the gun possession of 'law-abiding citizens.' " *Id.* ¶ 37 (citing *Bruen*, 597 U.S. at 71). The court noted that *Bruen* repeats the phrase "law-abiding" 18 times between Justice Thomas's majority opinion and the concurrences. *Id.* Thus, the court concluded that "based on the plain, clear, and repeated language of the justices in the majority, [the] defendant is simply outside the box drawn by *Bruen*." *Id.*

¶ 50 Numerous Illinois Appellate Courts have similarly concluded that felons are not included in the class of individuals protected by the second amendment. See, *e.g.*, *People v. Redmond*, 2025 IL App (1st) 231795, ¶ 43 (rejecting constitutional challenge to the armed violence statute (see 720 ILCS 5/33A-2(a) (West 2018)) because "an individual committing a felony is not a law-abiding citizen" and thus "possession of a firearm while committing a felony is not protected [conduct] under the second amendment"); *People v. Smith*, 2025 IL App (5th) 230656, ¶ 25, *pet. for leave to appeal pending*, No. 132483 (filed Nov. 14, 2025) (rejecting constitutional challenge

to armed violence statute (see 720 ILCS 5/33A-2(a) (West 2022)) because "a defendant who is in the process of committing a felony while possessing an operational firearm does not fall into the category of 'the people' protected by the second amendment"); *Welch*, 2025 IL App (1st) 231116, ¶ 57, *pet. for leave to appeal pending*, No. 132441 (filed Nov. 17, 2025) ("Because the second amendment only protects the rights of law-abiding citizens to bear arms, the *Bruen* analytical framework does not apply to the [offense of] UPWF"); *People v. Rich*, 2025 IL App (1st) 230818, ¶ 63, *pet. for leave to appeal pending*, No. 132165 (filed Aug. 21, 2025) (rejecting constitutional challenge to the UPWF statute at the first step of the *Bruen* analysis because "possessing a firearm while having a felony conviction falls [outside] the scope of the second amendment"); *People v. Lopez*, 2025 IL App (1st) 232120, ¶ 22, *pet. for leave to appeal pending*, No. 131973 (filed June 26, 2025) (rejecting constitutional challenge to armed habitual criminal statute (see 720 ILCS 5/24-1.7(a) (West 2022)) "because the second amendment only protects the right of law-abiding citizens to bear arms"); *People v. Cadengo*, 2025 IL App (4th) 240568, ¶¶ 72, *pet. for leave to appeal pending*, No. 131922 (filed June 9, 2025) (rejecting argument that a trial court order requiring a defendant convicted of felony stalking to permanently surrender her FOID card and all firearms violated the second amendment, based on its conclusion that "[b]ecause of defendant's felony conviction, she is not a 'law-abiding citizen,' so the second amendment's guarantees to [*sic*] do not apply to her"); *People v. Huff*, 2025 IL App (4th) 240762, ¶ 16, *pet. for leave to appeal pending*, No. 131792 (filed May 5, 2025) (rejecting constitutional challenge to UPWF statute agreeing that *Bruen* only applies to law-abiding citizens); *People v. Gray*, 2025 IL App (1st) 191086-B, ¶ 20, *pet. for leave to appeal pending*, No. 131719 (filed May 19, 2025) (rejecting constitutional challenge to armed habitual criminal statute (see 720 ILCS 5/24-1.7(a) (West 2016)) because the second amendment does not "extend[ ] protection to anyone other than 'law-abiding

citizens' ''); *People v. Boss*, 2025 IL App (1st) 221855, ¶ 33 (rejecting constitutional challenge to the UPWF statute because "the second amendment does not apply to a felon's firearm possession"); *People v. Kelley*, 2024 IL App (1st) 230569, ¶ 22, *pet. for leave to appeal pending*, No. 130821 (filed June 27, 2024) (rejecting constitutional challenge to the armed habitual criminal statute (see 720 ILCS 5/24-1.7 (West 2020)), stating that "*Bruen* is clear that second amendment rights apply to law-abiding citizens for self-defense"); *People v. Burns*, 2024 IL App (4th) 230428, ¶ 21, *pet. for leave to appeal pending*, No. 130804 (filed June 21, 2024) (rejecting the defendant's constitutional challenge to the UPWF statute, holding that "*Bruen* simply does not apply to [the] defendant. The second and fourteenth amendments protect the right of 'law-abiding citizens' to possess handguns"); *People v. Hatcher*, 2024 IL App (1st) 220455, ¶ 54 (observing that "*Bruen* limits the second amendment's scope to (1) citizens who are (2) law-abiding and (3) responsible, and (4) who use firearms for self-defense"); *People v. Mobley*, 2023 IL App (1st) 221264, ¶¶ 28, 29, *pet. for leave to appeal pending*, No. 130417 (filed Jan. 31, 2024) (where the record showed that the defendant had "at least 14 felony convictions, including convictions for violent crimes," the defendant could not challenge under *Bruen* the UPWF statute as applied to him because "*Bruen* strongly suggests the test only applies when a regulation impacts a law-abiding citizen's ability to keep and bear arms");

¶ 51    This court has also concluded in several unpublished decisions that felons are not protected by the second amendment.  See *People v. Tapia*, 2026 IL App (2d) 240721-U, ¶ 53 ("Because felons are not included within 'the people' referenced in the second amendment, [the] defendant's challenge to the UPWF statute therefore fails at the first step of the *Bruen* framework."); *People v. Martinez*, 2024 IL App (2d) 230305-U, ¶ 34, *pet. for leave to appeal pending*, No 131147 (filed Nov. 16, 2024) (rejecting constitutional challenge to the UPWF statute, stating that we "join the

great weight of authority in Illinois and agree that the second amendment does not apply to a felon's firearm possession"); *People v. Echols*, 2024 IL App (2d) 220281-U, ¶ 153 ("As defendant does not dispute that he is a convicted felon for purposes of the [UPWF] statute, he is not a 'law-abiding' citizen afforded the same second amendment protections enjoyed by 'the people' referenced in the second amendment."); *People v. Gross*, 2024 IL App (2d) 230017-U, ¶ 24, *pet. for leave to appeal pending*, No. 130714 (filed May 23, 2024) (rejecting constitutional challenge to the UPWF statute, holding "that 'the people' referenced in the second amendment are law-abiding citizens."); *People v. Smith*, 2023 IL App (2d) 220340-U, ¶ 57, *pet. for leave to appeal pending*, No. 130343 (filed Jan. 4, 2024) (rejecting constitutional challenge to the armed habitual criminal statute (see 720 ILCS 5/24-1.7 (West 2020)), stating that the defendant, as a felon, was "not a 'law-abiding' citizen afforded the same second amendment protections enjoyed by 'the people' reference[d] in the second amendment.").

¶ 52    We acknowledge that there is support for defendant's argument that his status as a felon is irrelevant to whether his conduct is presumptively protected under the second amendment.  See, *e.g.*, *People v. McCorkle*, 2025 IL App (5th) 230238, ¶ 22 (stating that a defendant's status as a felon is more properly evaluated under *Bruen*'s second prong); *Wade*, 2025 IL App (1st) 231683, ¶ 49, *pet. for leave to appeal pending*, No. 132355 (filed Oct. 8, 2025) (same); *People v. Macias*, 2025 IL App (1st) 230678, ¶ 28, *pet. for leave to appeal pending*, No. 132054 (filed Sept. 3, 2025) (same); *People v. Travis*, 2024 IL App (3d) 230113, ¶ 26, *pet. for leave to appeal pending*, No. 130696 (filed May 16, 2024) (finding that "second amendment's plain language does not exclude felons" and proceeding to second step of *Bruen* analysis); *People v. Stephens*, 2024 IL App (5th) 220828, ¶ 34, *pet. for leave to appeal pending*, No. 131232 (filed Dec. 2, 2024) (stating that the defendant's status as a felon "is more properly evaluated under the second prong of the

*Bruen* analysis"); *People v. Brooks*, 2023 IL App (1st) 200435, ¶ 89-90, *petition for leave to appeal pending*, No. 130153 (filed Oct. 30, 2023) (stating that "[h]ow the defendant's prior felony might impact his second amendment right to possess a firearm is more properly evaluated under the second step's historical tradition analysis").  However, we find no reason to depart from our prior decisions, and we continue to adhere to our decisions that join the authority holding otherwise.

¶ 53   Even assuming, *arguendo*, that defendant's conduct was presumptively protected under the second amendment, defendant's constitutional challenge would fail under *Bruen*'s second step. Defendant argues that there is no historical tradition of firearm regulation that supports a flat ban on firearm possession by convicted felons.  We disagree.  In *Martinez*, although we found that the defendant did not meet the first step of the *Bruen* analysis, we nevertheless considered and rejected the same arguments defendant now advances.  See *Martinez*, 2024 IL App (2d) 230305-U ¶¶ 35-49, *pet. for leave to appeal pending*, No 131147 (filed Nov. 16, 2024).  We find no reason to depart from our analysis in *Martinez*, and we adopt that analysis here.  Indeed, every published decision that has reached the second step of the *Bruen* analysis when considering a constitutional challenge to the UPWF statute has found that the statute was consistent with this nation's historical tradition of firearm regulation and, thus, the challenge failed.  See, *e.g.*, *People v. Cox*, 2025 IL App (1st) 241260, ¶¶ 15-23; *Rich*, 2025 IL App (1st) 230818, ¶ 66, *pet. for leave to appeal pending*, No. 132165 (filed Aug. 21, 2025); *Travis*, 2024 IL App (3d) 230113, ¶¶ 27-33, *pet. for leave to appeal pending*, No. 130696 (filed May 16, 2024); *Stephens*, 2024 IL App (5th) 220828, ¶ 34-39, *pet. for leave to appeal pending*, No. 131232 (filed Dec. 2, 2024).

¶ 54                                III. CONCLUSION

¶ 55   For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 56   Affirmed.